## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JANE DOES 1-6, et al.,

                   Plaintiffs,

     v.

JANET T. MILLS, Governor of the State of
Maine, et al.

                   Defendants.

Civil Action No. 1:21-cv-00242-JDL

## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION OF STATE
## DEFENDANTS WITH INCORPORATED MEMORANDUM OF LAW

Defendants Janet T. Mills, Governor of the State of Maine, Jeanne M. Lambrew, Commissioner of the Maine Department of Health and Human Services (Department), and Dr. Nirav D. Shah, Director of the Maine Center for Disease Control (Maine CDC), (collectively, "State Defendants") hereby oppose Plaintiffs' Motion for Preliminary Injunction (ECF 3). Plaintiffs are unlikely to succeed on the merits of their Verified Complaint (ECF 1) and likewise have not demonstrated that the remaining factors weigh in their favor.  State Defendants request that Plaintiffs' motion be denied.

### STATUTORY BACKGROUND ON MANDATORY IMMUNIZATIONS

Since 1989, Maine has mandated that hospitals and other healthcare facilities require their employees to be vaccinated against several highly communicable diseases.  *See* P.L. 1989, ch. 487, § 11 (eff. Sept. 30, 1989) (requiring employees of hospitals to be vaccinated against measles, mumps, and rubella).  These requirements were enacted in the wake of the HIV/AIDS epidemic as part of comprehensive legislation designed to identify, report, prevent, and control communicable diseases that threaten the health of the people of Maine.

In 2001, the Maine Legislature moved the mandatory vaccinations requirements from statute to rules adopted by the Department.  P.L. 2001, ch. 185, §§ 1-2 (eff. Sept. 21, 2001).[1]  In response, the Department and the Maine CDC promulgated "Immunization Requirements for Healthcare Workers" (CDC Rule), which required that designated healthcare facilities (DHCF) mandate immunizations against several diseases for their employees.[2]  (Declaration of Donald Wismer [hereinafter, "Wismer Decl."] Ex. 1.)   Up until 2019, Maine law provided medical, religious, and philosophical exemptions from these vaccination requirements and from those required for school children.[3]  22 M.R.S.A. § 802(4-B)(B) (2019); 20-A M.R.S.A. § 6359(3)(B) (2008).  The rationale for requiring immunization against vaccine-preventable diseases is the same in school and healthcare settings: high vaccination rates are necessary to prevent the spread of communicable diseases through the population and among vulnerable populations, i.e., children and patients.  (Declaration of Nirav D. Shah [hereinafter, "Shah Decl."] ¶ 37.)

By 2018, vaccination rates for required vaccinations for school children and healthcare workers in Maine had fallen below the population-wide rates of vaccination necessary to prevent the spread of those communicable diseases.  (Declaration of Sara Gagné-Holmes [hereinafter, "SGH Decl."] Ex. 2; Declaration of Kimberly Patwardhan [hereinafter, "Patw. Decl."] Exhs. 2-5.)  Legislation thus was introduced in 2019 to eliminate nonmedical exemptions from these vaccination requirements in order to protect public health.[4]  L.D. 798 (129th Legis. 2019).

---

[1] Rulemaking provided a nimbler, more efficient process than legislation to address the rapid development of vaccines and vaccine recommendations.  *See* L.D. 1401, Statement of Fact (120th Legis. 2001).

[2] Those diseases were rubeola (measles), mumps, rubella (German measles), Hepatitis B, and varicella (chickenpox).  (Wismer Decl. Exh 1, § 2(A).)

[3] A statutory exemption for sincere philosophical beliefs was added in 2001.  *See* P.L. 2001, ch. 185, § 2 (eff. Sept. 21, 2001) (enacting 22 M.R.S. § 802(4-B)(B)).  (*See also* Wismer Decl. Ex. 1, § 3(B).)

[4] Hundreds of Mainers testified in support of, in opposition to, or neither for nor against the bill.  (Patw. Decl. ¶ 4; *see also* Patw. Decl. Exs. 2-18.).  Maine CDC and the Department offered testimony in support of L.D. 798, and that support was based in part on the then existing insufficient rates of vaccination for healthcare workers.  (SGH Decl. ¶ 32 & Ex. 2; Patw. Decl. Ex. 4.)  The bill, as amended, was also the topic of significant debate and discussion on the floors of both the Maine House and Senate.  (Patw. Decl. Exs. 20-26.)

Ultimately, effective September 19, 2019, the Maine Legislature eliminated nonmedical exemptions to vaccination requirements for healthcare workers and likewise mandated the removal of nonmedical exemptions from all Department vaccination requirements.[5]   P.L. 2019, ch. 154, §§ 9, 11 (effective Sept. 19, 2019) (repealing 22 M.R.S. § 802(4-B)(B)).   The law was the subject of a statewide people's veto referendum on March 3, 3020; 72.8% of Maine voters elected to keep the law in place.[6]   In order to comply with the statutory change, the Department removed nonmedical exemptions from the CDC Rule in April of 2021.  (SGH Decl. Ex. 1.)

## FACTUAL BACKGROUND

For the last 18 months, the world has contended with the worldwide COVID-19 pandemic.  COVID-19 is a respiratory illness caused by a virus (SARS-CoV-2) that spreads when an infected person exhales droplets and very small particles that contain the virus.  (Shah Decl. ¶¶ 11, 17.)  All variants of the COVID-19 virus exhibit asymptomatic transmission, meaning an infected person can spread the virus without noticing any symptoms.  (Shah Decl. ¶¶ 18-19, 26.)

To date, there have been approximately 219 million confirmed cases of COVID-19 worldwide, including approximately 41 million in the United States.  (Shah Decl. ¶ 13.)  There have been approximately 4.55 million deaths from COVID-19 worldwide; approximately 660,000 of those deaths were in the United States.  (Shah Decl. ¶ 13.)  As of September 14, 2021, there have been 81,177 total confirmed cases of COVID-19 in Maine, including 969 deaths from COVID-19.  (Shah Decl. ¶ 14.)

The Court is well aware of the various measures Maine officials took in response to the COVID-19 pandemic in order to prevent the spread of COVID-19.  *See, e.g.*, *Calvary Chapel of*

---

[5]   At the same time, the Legislature also eliminated nonmedical exemptions for school children and employees of daycare facilities.  P.L. 2019, ch. 154, §§ 1-2, 12 (effective Sept. 1, 2021).
[6]   Full results of the March 3, 2020, election are available on the website of the Maine Secretary of State: https://www.maine.gov/sos/cec/elec/results/index.html.

*Bangor v. Mills*, 459 F. Supp. 3d 273, 284 (D. Me. 2020) (addressing COVID-related gathering limits in houses of worship), *appeal dismissed*, 984 F.3d 21 (1st Cir. 2020); *Bayley's Campground Inc. v. Mills*, 463 F. Supp. 3d 22 (D. Me. 2020) (evaluating COVID-related self-quarantine requirements for interstate travelers), *aff'd*, 985 F.3d 153 (1st Cir. 2021); *Savage v. Mills*, 478 F. Supp. 3d 16 (D. Me. 2020) (reviewing several COVID-related restrictions on businesses).

Fortunately, there are now three COVID-19 vaccines that have been authorized for use by the Food and Drug Administration (FDA) and that are highly effective at preventing infection with COVID-19.[7]   (Shah Decl. ¶¶ 40-43.)   The first COVID-19 vaccine doses in Maine were administered on December 14, 2020.  (SGH Decl. ¶ 15.)  In the interest of preserving health system capacity, Maine CDC prioritized eligibility for those first doses to frontline healthcare professionals and patient facing staff in, among others, hospitals, long-term care facilities, emergency medical services, physician practices, and dental practices.  (SGH Decl. ¶¶ 15-18.)

Nevertheless, given the length of the pandemic, several variants of SARS-CoV-2 have emerged over time, including the highly contagious Delta variant.  (Shah Decl. ¶ 22.)  The Delta variant is more than twice as contagious as previous variants and may cause more severe illness than previous variants in unvaccinated people.  (Shah Decl. ¶ 22.)  Individuals infected with the Delta variant carry a much higher viral load, making the virus far more contagious and allowing it to spread and multiply in a shorter time period; an individual infected with the Delta variant can begin spreading it to others within 24 to 36 hours of exposure.  (Shah Decl. ¶¶ 24-25.)

The gold standard to prevent and stop the spread of communicable diseases, including COVID-19, is vaccination.  (Shah Decl. ¶ 34.)  When immunization rates fall below the necessary

---

[7]  Months before the COVID-19 vaccines were available, the Department and Maine CDC worked with hospitals, healthcare providers, health centers, and many others to develop a plan to facilitate distribution and administration of any COVID-19 vaccine that received authorization or approval from FDA.  (SGH Decl. ¶ 6.)  The Department and Maine CDC also hosted weekly COVID-19 vaccine information sessions on, among other topics, the science of vaccines; methods for addressing vaccine hesitancy; and patient conversations.  (SGH Decl. ¶¶ 8, 13.)

population-level rate of vaccination for a particular disease, both vaccinated and unvaccinated individuals are at risk of infection.  (Shah Decl. ¶ 38.)  In light of the Delta variant, epidemiological models suggest that at <u>least</u> 90% of the population would need to be vaccinated against COVID-19 in order to achieve population-level immunity.[8]  (Shah Decl. ¶ 29.)

The Delta variant was first identified in Maine via genomic sequencing on May 11, 2021. (Shah Decl. ¶ 49.)  As of August 27, 2021, the Delta variant accounted for 96.7% of all positive COVID-19 samples sequenced in Maine, and the Delta variant is now the predominant variant within the United States.  (Shah Decl. ¶ 50.)

Throughout the pandemic, Maine CDC has tracked statewide confirmed cases of COVID-19, including the number of healthcare workers who have contracted COVID-19, and investigated outbreaks of COVID-19, including in healthcare settings.  After vaccines became available, Maine CDC also started tracking the rate of COVID-19 vaccination among the general population and among employees of DHCFs.  (SGH Decl. ¶ 30.)

Most healthcare facility outbreaks are the result of healthcare workers who bring COVID-19 into the facility.  (Shah Decl. ¶ 48.)  As of September 9, 2021, 5,723 self-identified healthcare workers in Maine have contracted COVID-19.  (Shah Decl. ¶ 45.)  Of those, approximately 1,900 (or more than one third) have occurred since January 18, 2021 (i.e., the first date that any person could be considered fully vaccinated against COVID-19).  (Shah Decl. ¶ 45.)  On August 11, 2021, four of the fourteen outbreaks then under investigation by Maine CDC were occurring in healthcare facilities.  (Shah Decl. ¶ 47.)  By September 3, 2021, nineteen of the thirty-three COVID-19 outbreaks under investigation by Maine CDC were occurring in healthcare facilities. (Shah Decl. ¶ 46.)

---

[8]  Under prior models formulated based on prior variants, only around 70% of the population would have needed to be vaccinated to achieve population-level immunity.  (Shah Decl. ¶ 29.)

For the monthly reporting period ending July 31, 2021, the rate of COVID-19 vaccines among healthcare workers in certain DHCFs was as follows:

- Ambulatory Surgical Centers: 85.9%
- Assisted Housing Facilities: 74.7%
- Hospitals: 80.3%
- Intermediate Care Facilities for Individuals with Intellectual Disabilities: 68.2%
- Nursing Homes: 73.0%

(Shah. Decl. ¶ 53.)  All facilities fell significantly below the minimum 90% threshold believed to be needed to reduce the likelihood of facility-based outbreaks of COVID-19.  (Shah Decl. ¶ 54.)

Based on these and other facts, Maine CDC determined that requiring COVID-19 vaccinations for healthcare workers in certain high-risk settings was necessary to protect public health, healthcare workers, and Maine's healthcare system from the further spread of COVID-19. (Shah Decl. ¶ 55.)  Accordingly, the Department and Maine CDC amended the CDC Rule on an emergency basis [hereinafter, "Emergency CDC Rule"] to required DHCFs, Dental Health Practices, and Emergency Medical Services (EMS) Organizations to ensure their employees were vaccinated against COVID-19.  (Shah Decl. ¶ 55.)  Maine CDC determined that these types of facilities and settings posed a higher risk for the transmission of the virus that causes COVID-19 because of the patient populations served and type of care provided.[9]  (Shah Decl. ¶ 55; *see also* Shah Decl. ¶¶ 56-58 (describing public health reasons for issuance of Emergency CDC Rule).)

In reaching the decision to adopt the Emergency CDC Rule, Maine CDC considered whether there were other, less restrictive measures that might be appropriate instead of the Emergency CDC Rule.  As discussed *infra*, those options were considered, but would not have been as effective at stopping the spread of COVID-19 in the covered facilities.  (Shah Decl. ¶¶ 59-67.)

---

[9]  The facilities outbreaks described above were occurring in facilities that are now covered by the Emergency CDC Rule.  (Shah Decl. ¶¶ 46-47.)

**ARGUMENT**

In determining whether to issue a preliminary injunction, the court considers four factors.

Those factors are: (1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Douglas v. Lalumiere*, No. 2:20-CV-00227-JDL, 2021 WL 641370, at *2 (D. Me. Feb. 18, 2021)

(cleaned up).  Plaintiffs have not met their burden.

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR COMPLAINT

Of the four relevant factors, "the movant's likelihood of success is the touchstone of the preliminary injunction inquiry.  If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *Id.* (cleaned up).

### A.   THE EMERGENCY CDC RULE AND SECTION 802(4-B) DO NOT VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS TO FREE RELIGIOUS EXERCISE.

In Count I, Plaintiffs assert a violation of their right to free religious exercise by the so-called "Governor's COVID-19 Vaccine Mandate."  (ECF 1 ¶¶ 122-39.)  The First Amendment's Free Exercise Clause provides in pertinent part: "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) (incorporating Free Exercise Clause against the States via the Fourteenth Amendment).

Plaintiffs' arguments on their Free Exercise claim are a hodgepodge of constitutional and statutory claims, and they fail to grapple with or even properly identify the two laws whose effects they challenge.  As described above, Plaintiffs' claims involve two different State legal authorities: 1) the Emergency CDC Rule, which requires covered entities to ensure their employees are vaccinated against COVID-19; and 2) 22 M.R.S.A. § 802(4-B), which provides only medical

exemptions to mandatory vaccination requirements.  Regardless of the standard of review, neither the statute nor the rule violates Plaintiffs' First Amendment rights to free religious exercise.

### 1.    Mandatory vaccination laws with only medical exemptions are constitutional under *Jacobson* and its progeny.

The Supreme Court has long upheld states' mandatory vaccination laws to constitutional challenges.  In *Jacobson v. Massachusetts*, the City of Cambridge had an outbreak of smallpox, and it enacted a regulation requiring that, under threat of criminal penalties, <u>all</u> inhabitants, adults and children alike, be vaccinated.  197 U.S. 11, 12-13 (1905).  The ordinance included an exception for children "who present[ed] a certificate, signed by a registered physician, that they are unfit subjects for vaccination."  *Id.* at 12; *cf.* 22 M.R.S.A. § 802(4-B)(A) (including similar medical exemption for healthcare workers).  Mr. Jacobson refused to be vaccinated based on his personal beliefs, was convicted of violating the regulation, and then challenged the law on Fourteenth Amendment grounds.  197 U.S. at 13-14.  The Supreme Court rejected the challenge, stating that

> There are manifold restraints to which every person is necessarily subject for the common good.  On any other basis organized society could not exist with safety to its members.  <u>Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy.</u>

*Id.* at 26 (emphasis added); *accord Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 890 (1990) (rejecting system of religious accommodation "in which each conscience is a law unto itself").  The Court held that a regulation intended to protect against "an epidemic of disease which threatens the safety of its members" would be struck down only if it has "no real or substantial relation" to its goal of protecting the public health or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Jacobson*, 197 U.S. at 27, 31; *cf. Compagnie Francaise de Navigation a Vapeur v. Bd. of Health of State of La.*, 186 U.S. 380, 387 (1902) ("state quarantine laws and state laws for the purpose of preventing, eradicating, or controlling the spread of contagious or infectious diseases, are not repugnant to the Constitution of the United States").

Applying this test, the Court upheld the compulsory vaccination law because the means chosen to "stamp out the disease of smallpox"—mandatory vaccination—had "a real and substantial relation to the protection of the public and the public safety." *Jacobson*, 197 U.S. at 31.

Relying in part on *Jacobson*, the Supreme Court likewise has upheld a state's compulsory school vaccination laws against a Fourteenth Amendment challenge brought by a parent whose child was denied enrollment in both public and private schools. *See Zucht v. King*, 260 U.S. 174, 176 (1922) (explaining *Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination"). Later, when confronted with First Amendment challenges to laws regulating the conduct of children, the Supreme Court wrote:

> The rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it, have had recognition here . . . .

> But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation. [A parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

*Prince v. Massachusetts*, 321 U.S. 158, 165–67 (1944) (citations omitted) (emphasis added); *see also In re Z.S.*, 2015 ME 110, ¶¶ 7-10 121 A.3d 1286 (affirming trial court decision to approve vaccination of child in Department custody over mother's non-medical objections to vaccination).

Numerous courts subsequently have affirmed the principle that mandatory vaccination laws do not violate free exercise rights. *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) ("[Nikolao] has not been denied any legal right on the basis of her religion. Constitutionally, Nikolao has no right to a[ vaccine] exemption."); *Phillips v. City of New York*, 775 F.3d 538, 543-44 (2d Cir. 2015) ("mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause"); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 Fed. App'x 348, 352-54

9

(4th Cir. 2011) (concluding West Virginia's mandatory vaccination law that allowed for only medical exemptions withstood strict scrutiny review); *Harris v. Univ. of Mass., Lowell*, No. 21-CV-11244-DJC, 2021 WL 3848012, at *7 (D. Mass. Aug. 27, 2021) ("UMass is under no constitutional obligation to offer a religious exemption to its Vaccine Requirement."); *W.D. v. Rockland Cnty.*, No. 19-Civ.-2066 (JCM), 2021 WL 707065, at *22-31 (S.D.N.Y. Feb. 22, 2021) (upholding emergency exclusion order during measles outbreak that applied to all unvaccinated persons except those with medical exemptions in free exercise challenge); *Boone v. Boozman*, 217 F. Supp. 2d 938, 954 (E.D. Ark. 2002) (upholding compulsory vaccination law with medical exemption but no religious exemption against free exercise challenge), *appeal dismissed as moot*, 359 F.3d 1029 (8th Cir. 2004); *Brown v. Smith*, 235 Cal. Rptr. 3d 218, 224-25 (Cal. Ct. App. 2018) (holding mandatory school vaccination law with only medical exemptions did not violate free exercise clause under California Constitution); *F.F. v. New York*, 143 N.Y.S.3d 734 *passim* (N.Y. App. Div. 2021) (upholding repeal of religious exemptions from mandatory school vaccination law against free exercise challenge).

> ## 2. The Emergency CDC Rule and section 802(4-B) are neutral laws of general applicability that are rationally related to achieve the State's legitimate goal of stemming the spread of COVID-19.

The Free Exercise Clause protects "the right to believe and profess whatever religious doctrine one desires," *Smith*, 494 U.S. at 877, but it "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes),'" *id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). "Under *Smith*, a neutral law of general applicability is constitutional if it is supported by a rational basis," even when applied to religious practices. *See Illinois Bible Colleges Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017); *Parker v. Hurley*, 514 F.3d 87, 96 (1st Cir. 2008) (describing

*Smith* as "mere rationality standard"); *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d Cir. 2012) (neutral and generally applicable laws subject to rational basis review in Free Exercise analysis).

**Neutrality.**  The neutrality inquiry begins with the text of the law in question.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."  *Id.*  Neither the text of the Emergency CDC Rule nor the text of section 802(4-B) refers to religious practice, conduct, belief, or motivation.  Plaintiffs have not identified any such facially discriminatory language or even engaged with the facial neutrality analysis. Thus, the rule and statute are facially neutral.

The laws are also neutral because their object or purpose is not to infringe or restrict any particular religious practice and are not "specifically directed at religious practice."  *Smith*, 494 U.S. at 878.  As the record demonstrates, the object of the Emergency CDC Rule is to prevent the spread of COVID-19 among healthcare workers in high risk settings, protect patients and individuals from disease and death, and protect Maine's healthcare system.  (Shah Decl. ¶¶ 56-58.) Similarly, the Legislature's elimination of <u>all</u> nonmedical exemptions was intended to increase the overall rate of vaccination and protect individuals who are unable to be vaccinated for medical reasons.[10]  Neither the rule nor the statute can be said to be directed at religious practice.

Plaintiffs take particular umbrage with the existence of a medical exemption from vaccination requirements.  (ECF 3 at 7, 14-15.)  As of September 1, 2021, "[a] medical exemption is available to an employee who provides a written statement from a licensed physician, nurse

---

[10]  (*See, e.g.* Patw. Decl. Ex. 2 (testimony of Rep. Tipping); Patw. Decl. Ex. 18; Patw. Decl. Ex. 20 at H-397 (remarks of Rep. Ingwersen); Patw. Decl. Ex. 21 at S-556 to -557 & S-563 (remarks of Sen. Millett) & S-561 to -562 (remarks of Sen. Chenette); Patw. Decl. Ex. 22 at H-492 (remarks of Rep. Fecteau); Patw. Decl. Ex. 23 at S-653 to -654 (remarks of Sen. Carson); Patw. Decl. Ex. 24 at H-595 to -596 (remarks of Rep. McDonald); Patw Decl. Ex. 25 at S-754 (remarks of Sen. H. Sanborn) & S-755 (remarks of Sen. L. Sanborn).)

practitioner or physician assistant that, in the physician's, nurse practitioner's or physician assistant's professional judgment, immunization against one or more diseases may be medically inadvisable." 22 M.R.S.A. § 802(4-B)(A) (Supp. 2021). They claim the existence of this medical exemption necessarily means that Maine's laws are not neutral, relying on *Tandon v. Newsom*, where the Court stated: "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." 141 S. Ct. 1294, 1296 (2021) (second emphasis added). Plaintiffs claim that medical exemptions are secular, and that Maine law thus treats secular activity more favorably than religious exercise.[11]  (ECF 3 at 7-8.)

But Plaintiffs ignore the next step of the analysis. The Supreme Court went on to explain in *Tandon* that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." 141 S. Ct. at 1296. Plaintiffs simply assume that medical exemptions are comparable to religious exemptions without any analysis. That assumption ignores the Supreme Court's instruction.

As noted, the Legislature's goal in eliminating of nonmedical exemptions was to increase the overall rate of vaccination and protect the health of individuals who are unable to be vaccinated for medical reasons. (*See* Shah Decl. ¶ 39 (explaining circumstances when vaccination may be medically inadvisable).)  Requiring vaccination of persons whose health may be harmed by vaccination would not serve the State's interest in protecting those same individuals from the spread of communicable diseases and death. Medical exemptions are thus not "comparable" to religious exemptions under *Tandon*. *See Resurrection Sch. v. Hertel*, No. 20-2256, 2021 WL

---

[11]  Plaintiffs allege, without any elaboration or developed argument, that Maine law "provides for individualized medical exemptions but not religious." (ECF 3 at 7; ECF 1 ¶ 132.) State Defendants disagree with this characterization. Section 802(4-B)(A) vests authority regarding medical exemptions with healthcare providers, not State officials. Those healthcare providers are to utilize their professional judgment in deciding whether to sign a written statement in support a medical exemption. 22 M.R.S.A. § 802(4-B)(A).

3721475, at \*13 (6th Cir. Aug. 23, 2021) (concluding COVID-related mask mandate for secular and religious schools with exception for those medically unable to mask was neutral and generally applicable). Moreover, *Jacobson* strongly suggests that requiring individuals with health issues to be vaccinated would be unconstitutional. 197 U.S. at 38-39; *see also Rockland Cnty.*, 2021 WL 707065, at \*29 ("the medical exemption furthered Defendants' public health purpose by encouraging community-wide vaccination on the one hand, and protecting the lives and safety of those who could not be vaccinated, on the other").

Further, despite Plaintiffs' conclusory statements to the contrary, they have failed to show how either law is targeted to regulate their religious abstention, such that only they are affected by the laws, and there are no restrictions on secular abstention. *Cf. Lukumi*, 508 U.S. at 535-36 (explaining how ban on ritual animal sacrifice without banning other animal slaughter targeted specific practice of Santeria faith).

**General applicability.** The general applicability requirement prohibits the government from "in a selective manner impos[ing] burdens <u>only</u> on conduct motivated by religious belief." *Lukumi,* 508 U.S. at 543 (emphasis added). It "protect[s] religious observers against unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued <u>only</u> against conduct with a religious motivation." *Id.* at 542–43 (emphasis added).

Here, the Emergency CDC Rule applies equally to all covered entities: DHCFs, Dental Health Practices, and EMS Organizations. (SGH Decl. Ex. 3.) Those organizations must require their employees to show proof of vaccination against COVID-19, unless the employee is medically exempt. (SGH Decl. Ex. 3, §§ 2(A)(7), (B), (E).) Section 802(4-B) only permits employees to assert medical exemptions to mandatory vaccination requirements; exemptions based on any other reason, religious or otherwise, are not permitted. An individual's personal, philosophical, or

religious beliefs simply do not come into play under section 802(4-B); thus, the laws in question are generally applicable.[12]

**Rational basis review.**   Because the Emergency CDC Rule and Section 802(4-B) are neutral and generally applicable, the applicable standard of constitutional review is rational basis. Because "[s]temming the spread of COVID–19 is unquestionably a compelling interest," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam), the State's goal of stopping the spread of COVID-19 in certain facilities and protecting those unable to be vaccinated are unquestionably legitimate state interests.   And requiring vaccination, the most effective method of stopping the spread of communicable diseases (Shah Decl. ¶¶ 34, 67), is rationally related to achieving that goal.   *Accord Jacobson*, 197 U.S. at 31 (upholding municipality's mandatory vaccination law based on its "real and substantial relation" to protecting public health).

>   **3.      The Emergency CDC Rule and Section 802(4-B) are narrowly tailored to achieve the State's compelling interest of stemming the spread of COVID-19 among healthcare workers.**

As shown above, both Maine laws in question are neutral and generally applicable and "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531.   But if strict scrutiny were to apply, then both laws would still stand up against Plaintiffs' free exercise challenge.

As noted, "[s]temming the spread of COVID–19 is unquestionably a compelling interest," *Roman Cath. Diocese*, 141 S. Ct. at 67, and Plaintiffs do not seriously contend otherwise.   (ECF 3 at 8.)   Plaintiffs contend instead that the laws are not narrowly tailored.   Narrow tailoring requires the government to show that its policy is the "least restrictive means" of achieving its objective, *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981), and that it "seriously

---

[12]   Any individual who may have nonmedical reasons to object to vaccinations could still qualify for a medical exemption: Maine law distinguishes not by belief, but by medical condition.

14

undertook to address the problem with less intrusive tools readily available to it," *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).  To evaluate the requirement of narrow tailoring, "the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives."  *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Plaintiffs propose two alternatives that they assert are less restrictive: 1) continuing to comply with existing "face covering" and other "reasonable health and safety requirements" or 2) "submit[ting] to reasonable testing and reporting requirements."  (ECF 1 ¶¶ 76, 80; ECF 3 at 9-10.)  Plaintiffs assert that these measures were good enough for the last 18 months and they should continue to be good enough now.  (ECF 3 at 9-10.)  But these options would not be effective at achieving the State's goals, and some measures that Plaintiffs propose have <u>not</u> been effective.

Plaintiffs, as employees of the Provider Defendants, were required to comply with applicable law for infection control practices, including those pertaining to COVID-19.[13] Notwithstanding these existing health and safety protocols, there have been numerous outbreaks of COVID-19 at healthcare facilities during the last 18 months.  (Shah Decl. ¶ 65.)  As of September 3, 2021, 19 of the 33 outbreaks that Maine CDC was investigating occurred at healthcare facilities that are now covered by the Emergency CDC Rule.  (Shah Decl. ¶ 46.)  Continuing under current conditions would not achieve the State's goals of stopping the spread of COVID-19 in high risk facilities.  Moreover, there is no equivalency between measures taken before and after vaccines became available; when more effective measures to achieve the State's goals become available, the State should not be required to continue using less effective measures.

Plaintiffs also propose regular testing.  Maine CDC considered, but rejected, regular testing as an alternative to protect against the Delta variant.  (Shah Decl. ¶ 61.)  Given the speed with

---

[13] (*See* Declaration of Judy West ¶ 6; Declaration of Gail Cohen ¶ 6; Declaration of April Nichols ¶ 6; Declaration of Paul Bolin ¶ 6.)

which the Delta variant is transmitted, weekly or twice weekly testing would be wholly ineffective as a tool for preventing transmission.  (Shah Decl. ¶ 61.)  An employee who tests negative on a Monday morning could be exposed that afternoon and, within 36 hours, could be spreading the virus to others over the course of the several days until the next test.  (Shah Decl. ¶ 61.)

Daily testing was also considered, but rejected.  The most effective test utilized for the detection of the virus that causes COVID-19 is a polymerase chain reaction (PCR) test; a PCR test requires a minimum of 24 hours before results are available, and sometimes results are not available for up to 72 hours.  (Shah Decl. ¶ 62.)  Because of this delay, PCR testing on a daily basis would be insufficient for the same reasons that occasional testing is insufficient.  (Shah Decl. ¶ 62.)  Daily testing likely would require the use of the less-effective rapid antigen test, which provides results in fifteen minutes, but is more likely to provide false negative result; research shows that these tests correctly identify only about 50% of positive COVID-19 cases.  (Shah Decl. ¶ 62.)  Moreover, the nation is currently experiencing a shortage of rapid antigen tests, which is not expected to end in the next two months.  (Shah Decl. ¶ 62.)  Daily testing would not be effective at stopping the spread of COVID-19 in covered facilities, particularly in light of the Delta variant. (Shah Decl. ¶ 62.)

Plaintiffs also contend that State Defendants "tried nothing else" before resorting to adopting the Emergency CDC Rule.  (ECF 3 at 9.)  But the record shows that the Department and Maine CDC have engaged in extensive educational outreach to clinicians across the State, discussing the efficacy and safety of the three available COVID-19 vaccinations.  (SGH Decl. ¶¶ 13-14.)  Employees of the facilities covered by the Emergency CDC Rule were some of the first (if not the first) Maine residents eligible for vaccination.  (SGH Decl. ¶¶ 16-17.)  The State engaged in numerous programs to distribute vaccines across the State and to encourage vaccination statewide.  (SGH Decl. ¶¶ 20-29.)  And Plaintiffs' employers also encouraged vaccination by

16

making vaccines available onsite and making time spent getting vaccinated compensable.[14] Nevertheless, as of July 31, 2021, the average employee rate of COVID-19 vaccination at ambulatory surgical centers, hospitals, and nursing homes was 85.9%, 80.3%, and 73.0%, respectively—below the minimum 90% vaccination rate now believed to be needed for population-level immunity.  (SGH Decl. ¶ 33; Shah Decl. ¶¶ 53-54.)

In sum, there were no less restrictive alternatives that would have been effective at achieving the State's goals.  *Ashcroft*, 542 U.S. at 666.

### 4.    Plaintiffs' other arguments are meritless.

In support of its Free Exercise claim, Plaintiffs argue that John Doe 1 has sincerely held religious beliefs that are substantially burdened by the Emergency CDC Rule and Section 802(4-B).  (ECF 18 at 5-7.)  In support, they rely on *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).  *Burwell* is inapplicable to this case because its analysis rested on the Religious Freedom Restoration Act (RFRA), 42 U.S.C.A. §§ 2000bb to 2000bb-4 (Westlaw, through Publ. L. 103-141).  Congress enacted RFRA in response to *Smith* in order to provide increased protection to religious exercise.  *Burwell*, 573 U.S. at 693-95.  But RFRA categorically does not apply to State and municipal actors.  *See City of Boerne v. Flores*, 521 U.S. 507, 529-36 (1997).

### B.    IT IS UNDISPUTED THAT FEDERAL LAW APPLIES WITHIN THE STATE OF MAINE.

Count II of Plaintiffs' Complaint is puzzling and, ultimately, largely duplicative of the rest of their claims.  (ECF 1 ¶¶ 140-51.)  Plaintiffs demand that Defendants acknowledge the supremacy of federal law over state law and its applicability in the State.  (ECF 3 at 2.)  State Defendants have already done so.  (*See* ECF 43 at 1.)  In any event, to the extent that this count is

---

[14]  (*See* Declaration of Judy West ¶ 5; Declaration of Gail Cohen ¶ 5; Declaration of April Nichols ¶ 5; Declaration of Paul Bolin ¶ 5.)

directed at State Defendants, or even states a valid cause of action, Plaintiffs have provided no evidence of how State Defendants have denied the supremacy of federal law or the inapplicability of Title VII.  (ECF 1 ¶ 144 (alleging State Defendants "tacitly stated" Title VII is inapplicable in Maine).)  The opposite is true.

As between the Emergency CDC Rule and Title VII, Maine CDC has already published guidance stating that the Emergency CDC Rule does not prohibit employers from providing accommodations for employees' religious beliefs where applicable.[15]  (SGH Decl. ¶ 36.)  And even if Plaintiffs could be said to be making a preemption claim in Count II—a claim they do not articulate or analyze under any traditional preemption analysis—they only, as to State Defendants, assert "preemption" of Maine law by the First Amendment.  (ECF 3 at 5.)  Those claims are addressed fully in Count I above.

### C. THE EMERGENCY CDC RULE AND SECTION 802(4-B) DO NOT DENY PLAINTIFFS EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENTH AMENDMENT.

In Count III of their Complaint, Plaintiffs allege that their right to equal protection of the laws has been violated by the lack of a religious exemption in the Emergency Rule and section 802(4-B).  "Where a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts." *Wirzburger v. Galvin*, 412 F.3d 271, 282 (1st Cir. 2005) (citing *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004)).

As shown above, the State's goals of stopping the spread of COVID-19 in certain facilities and protecting those unable to be vaccinated are legitimate state interests.  Requiring vaccination,

---

[15]  Moreover, Title VII does not require employers to make accommodations that compromise workplace safety. *See, e.g.*, *Robinson v. Children's Hospital Boston*, No. 14-10263-DJC, 2016 WL 1337255, at **9-10 (D. Mass. Apr. 5, 2016) (concluding hospital did not violate Title VII when it terminated an employee who refused the flu vaccine based on her religious beliefs pursuant to a hospital vaccination policy that only allowed for medical exemptions).

the most effective method of stopping the spread of communicable diseases (Shah Decl. ¶¶ 34, 67), is rationally related to achieve those goals.

Plaintiffs argue that *Romer v. Evans*, 517 U.S. 620, 635 (1996), dictates the result in this case.  (ECF 3 at 14-15.)  But *Romer* involved an amendment to the Colorado state constitution that targeted, with <u>express</u> language, persons of homosexual, lesbian, or bisexual orientation, *Romer*, 517 U.S. at 624; the two state laws at issue do no such thing.  Further, the Supreme Court applied a rational basis review to the law in question in *Romer,* and State Defendants have already demonstrated how the laws at issue are rationally related to a legitimate state interest.

### D.      PLAINTIFFS' CIVIL CONSPIRACY CLAIM IS WITHOUT MERIT.

Finally, in Count V, Plaintiffs allege that State Defendants and Plaintiffs' employers have engaged in a civil conspiracy to deprive them of equal protection under the law by prohibiting any religious exemption or accommodation.[16]  (ECF 1 ¶¶ 180-97.)  *See Alston v. Spiegel*, 988 F.3d 564, 577 (1st Cir. 2021) (describing elements of civil conspiracy claim under 42 U.S.C. § 1985(3)).  Plaintiffs are unlikely to succeed on the merits of this claim because, as demonstrated above, their constitutional rights have not been violated and because, even at this early stage, they have failed to plausibly allege any conspiracy between and among the Defendants or discriminatory animus.

Most notably, Plaintiffs presume and allege it was State Defendants who eliminated religious exemptions from vaccination requirements.  (ECF 1 ¶¶ 183-84.)  But, as shown above, the Maine Legislature eliminated <u>all</u> nonmedical exemptions in 2019.  P.L. 2019, ch. 154, §§ 9, 11.  Thus, the alleged "overt acts" are in fact allegations that State Defendants are complying with Maine law.  (ECF 3 at 12-13.)  Further, a mere alignment of interests among the Defendants to

---

[16]  While the Supreme Court and the First Circuit have speculated that Section 1985 might apply to other class-based invidiously discriminatory animus, they have never applied Section 1985 to anything other than race.  *Griffin v. Breckenridge*, 403 U.S. 88, 102 & n.9 (1971); *Soto–Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1, 4 (1st Cir.2012).

protect the health of patients and staff through vaccination of healthcare workers against COVID-19 is insufficient as a matter of law to establish an agreement or meeting of the minds. *See Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 337 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011). Plaintiffs' claim rests on the independent actions of the alleged wrongdoers, not the concerted action necessary for a conspiracy claim. *Alston*, 988 F.3d at 578.

## III. EVEN IF PLAINTIFFS HAD ESTABLISHED A LIKELIHOOD OF SUCCESS, THE REMAINING FACTORS SUPPORT DENYING AN INJUNCTION.

Plaintiffs have not established irreparable harm, that the balance of hardships tips in their favor, or that the public interest warrants an injunction.

As to irreparable harm, Plaintiffs claim that even minimal infringements of their First Amendment rights constitute irreparable injury, relying on the Supreme Court's decision in *Roman Catholic Diocese*, 141 S. Ct. at 67. But as the Court has already pointed out, the restrictions at issue in that case directly "prevented certain religious gatherings but did not prevent secular gatherings involving the same number of people," thereby preventing religious practices. (ECF 44 at 3.) "Here, in contrast, the Emergency Rule does not prevent the nine Plaintiffs from adhering to their sincerely held religious beliefs that compel them to decline to receive any of the three currently available vaccines." (ECF 44 at 3; *see also* ECF 1 ¶ 68.) And the other Defendants, Plaintiffs' employers, have explained fully how there are remedies available to Plaintiffs.

With respect to the balance of harms, State Defendants are seeking to protect the health and lives of healthcare workers and patients across the State, and that far outweighs the harm, if any, that Plaintiffs may suffer. Similarly, the public interest weighs heavily in State Defendants favor. Plaintiffs should not be permitted to interfere with the careful, medically based approach taken by State Defendants and the Legislature.

**CONCLUSION**

For the reasons set forth above, State Defendants request that Plaintiffs' motion be denied.


DATED:  September 15, 2021                     Respectfully submitted,

                                               AARON M. FREY
                                               Attorney General

                                               THOMAS A. KNOWLTON
                                               Deputy Attorney General
                                               Chief, Litigation Division
                                               thomas.a.knowlton@maine.gov

                                               /s/ Kimberly L. Patwardhan
                                               KIMBERLY L. PATWARDHAN
                                               Assistant Attorney General
                                               kimberly.patwardhan@maine.gov

                                               VALERIE A. WRIGHT
                                               Assistant Attorney General
                                               valerie.a.wright@maine.gov

                                               Office of the Attorney General
                                               6 State House Station
                                               Augusta ME  04333-0006
                                               Tel.  (207) 626-8800
                                               Fax (207) 287-3145

                                               Attorneys for State Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2021, I electronically filed this document and its attachments with the Clerk of the Court using the CM/ECF system and that the same will be sent electronically to registered participants as identified in the CM/ECF electronic filing system for this matter.

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8570
Fax (207) 287-3145
kimberly.patwardhan@maine.gov