**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**
**Bangor Division**

| | |
|---|---|
| JANE DOES 1–6, JOHN DOES 1–3, <br> JACK DOES 1–1000, JOAN DOES 1–1000, <br><br>        Plaintiffs, <br><br> v. <br><br> JANET T. MILLS, in her official capacity as <br> Governor of the State of Maine, <br> JEANNE M. LAMBREW, in her official capacity <br> as Commissioner of the Maine Department of <br> Health and Human Services, <br> NIRAV D. SHAH, in his official capacity as <br> Director of the Maine Center for Disease Control <br> and Prevention, <br> MAINEHEALTH, <br> GENESIS HEALTHCARE OF MAINE, LLC, <br> GENESIS HEALTHCARE, LLC, <br> NORTHERN LIGHT HEALTH FOUNDATION, <br> MAINEGENERAL HEALTH, <br><br>        Defendants. | Case No. <u>1:21-cv-00242-JDL</u> |

**PLAINTIFFS' OMNIBUS REPLY[1]**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

[1]      Due to the overlapping issues in Defendants' Oppositions (dkt. 49, Government Defendants' Opposition to Motion for Preliminary Injunction ("Government Opposition"); dkt 50, MaineHealth, et al. Opposition to Motion for Preliminary Injunction, ("MaineHealth Opposition"); dkt. 51, Northern Light Opposition to Motion for Preliminary Injunction, "NL Opposition")), Plaintiffs, in the interest of judicial economy, submit an omnibus Reply to all of them.

## INTRODUCTION

On September 14, 2021, the United States District Court for the Northern District of New York granted a temporary restraining order (TRO) enjoining the Governor of New York and other government defendants from enforcing a COVID-19 vaccine mandate on healthcare workers that is virtually identical to Governor Mills' COVID-19 Vaccine Mandate challenged by Plaintiffs here. *See Dr. A. v. Hochul*, No. 1:21-cv-01009-DNH-ML (N.D.N.Y. Sept. 14, 2021). (A true and correct copy of the *Dr. A.* TRO is attached hereto as EXHIBIT A and incorporated herein.) In *Dr. A.*, plaintiffs challenged New York's COVID-19 vaccine mandate on healthcare workers "to the extent it categorically requires health care employers to deny or revoke religious exemptions from COVID-19 vaccination mandates." (Ex. A at 2.) Specifically, the court issued a TRO enjoining the officials from enforcing the COVID-19 vaccine mandate such that they are "**barred from enforcing any requirement that employers deny religious exemptions from COVID-19 vaccination or that they revoke any exemptions employers already granted before the vaccine mandate issued**." (Ex. A at 3 (emphasis added).) Further, the court enjoined the New York officials "from interfering in any way with the granting of religious exemptions from COVID-19 vaccination going forward, or with the operation of exemptions already granted." (*Id.*) Finally, the court enjoined them from "taking any action, disciplinary or otherwise, against the licensure, certification, residency, admitting privileges or other professional status or qualification of any of the plaintiffs **on account of their seeking or having obtained a religious exemption from mandatory COVID-19 vaccination**." (*Id.* (emphasis added).) And, the claims brought by plaintiffs in *Dr. A* are also virtually identical to the claims raised in Plaintiffs' Verified Complaint. (*See* No. 1:21-cv-01009-DNH-ML, dkts. 1, 5.)

Governor Mills' COVID-19 Vaccine Mandate here is identical to New York's in its removal of religious accommodations, and its fate should be the same. Despite their contentions to the contrary, precluding, revoking, or denying merited requests for religious exemption from the Governor's COVID-19 Vaccine Mandate is plainly unconstitutional, runs roughshod over the Supremacy Clause's demand that federal law be applied in the States, and imposes irreparable First Amendment injury on Plaintiffs' sincerely held religious beliefs. Government Defendants' imposition of a mandatory vaccine requirement and their concomitant removal of religious exemptions while maintaining similarly situated secular exemptions is unconstitutional and should be enjoined. For, indeed, "**[e]ven in times of crisis—perhaps *especially* in times of crisis—we have a duty to hold governments to the Constitution**." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Gorsuch, J.) (bold emphasis added).

## LEGAL ARGUMENT

I.    **MAINE'S INTENTIONAL REMOVAL OF RELIGIOUS EXEMPTIONS FROM ITS VACCINE MANDATE WHILE ALLOWING MEDICAL EXEMPTIONS VIOLATES THE FIRST AMENDMENT.**

A.    **Maine's Singling Out of Religious Employees Who Decline Vaccination for Especially Harsh Treatment Is Not Religiously Neutral.**

Maine[2] contends that its mandate that all healthcare workers in the State become fully vaccinated against COVID-19 by a date certain and its concomitant removal of religious exemptions from the mandate are facially neutral because they do not mention religion. (Gov't Opp'n 11.) This is both factually and legally absurd. Importantly, Maine entirely misses the relevant standard, namely, that "**government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever**

---

[2]    Unless otherwise indicated, "Maine" refers collectively to the Government Defendants.

they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (bold emphasis added). In fact, "the regulations cannot be viewed as neutral because they single out [religion] for especially harsh treatment." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020). "**When a state so obviously targets religion for differential treatment, our job becomes much clearer**." *South Bay*, 141 S. Ct. at 717 (Gorsuch, J.) (emphasis added).

Here, Maine has plainly singled out religious employees who decline vaccination for especially harsh treatment (*i.e.*, depriving them from earning a living anywhere in the State), while favoring employees declining vaccination for secular, medical reasons. Under the *Tandon*, *South Bay*, and *Catholic Diocese* triumvirate, Government Defendants' discriminatory treatment of unvaccinated religious employees violates the First Amendment. Maine's only answer to *Tandon*'s unequivocal condemnation of treating **any** secular activity more favorably than religious activity is to declare that it "eliminat[ed] all nonmedical exemptions." (Gov't Opp'n 11.) Even a cursory examination, however, reveals this contention to be an intentional half-truth.[3] The whole truth is that Maine removed **only religious exemptions** from the list. Under the prior version of Maine's immunization exemption requirements, Maine allowed for (a) medical exemptions, and (b) exemptions for any employee who "states in writing an opposition to immunization because of a sincerely held religious belief." (V. Compl. ¶ 48.) On August 14, 2021, however, Maine removed **only the religious exemption from the rule**—i.e., "all nonmedical exemptions" (Gov't Opp'n 11). "The Government's argument is too cute by half (or perhaps two-thirds)." *United States v. Parker*, 30 F.3d 542, 552 (4th Cir. 1994).

---

[3]    "Half the Truth is often a great Lie." Benjamin Franklin, *Poor Richard improved: Being an Almanack and Ephemeris . . . for the Year of our Lord 1758*, https://founders.archives.gov/documents/Franklin/01-07-02-0146 (last visited Sept. 17, 2021).

As the Supreme Court has made plain, "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Cynically masking the direct targeting of religious exemptions by calling it a general removal of all nonmedical exemptions is an impermissible "covert suppression of particular religious beliefs." *Id.* The First Amendment demands more.

**B.      The Vaccine Mandate's More Favorable Treatment of Employees Declining Vaccination for Secular, Medical Reasons as Compared to Employees Declining Vaccination for Religious Reasons Is Not Generally Applicable.**

Maine's continuing recognition of only medical exemptions also removes the Vaccine Mandate from neutrality and general applicability. Maine contends that offering medical exemptions from its Vaccine Mandate while excluding religious exemptions does not even implicate the First Amendment. (Gov't Opp'n 11–12.) A host of precedent demonstrates the absurdity of that contention.

In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, Justice (then-Judge) Alito wrote unequivocally for the court that "**[b]ecause the Department makes exemptions from its [no beards] policy for secular reasons and has not offered any substantial justification for refusing to provide similar treatment for officers who are required to wear beards for religious reasons, we conclude that the Department's policy violates the First Amendment**." 170 F.3d 359, 360 (3d Cir. 1999) (emphasis added). There, like Maine here, the city argued that it was required to provide medical accommodations under federal law but that religious exemptions were not required. *Id.* at 365. The court squarely rejected that rationale: "It is true that the ADA requires employers to make reasonable accommodations for individuals with disabilities. However, **Title VII of the Civil Rights Act of 1964 imposes an identical obligation on employers with respect to accommodating religion.**" *Id.* (emphasis added) (cleaned up). And

4

there (as here, V. Compl. ¶¶ 117–121) the government "has clearly been put on notice of Title VII's religious accommodation requirements." 170 F.3d at 365. Thus, the court held, "**we cannot accept the Department's position that its differential treatment of medical exemptions and religious exemptions is premised on a good-faith belief that the former may be required by law while the latter are not**." *Id.* (emphasis added).

Here, Maine contends that the availability of medical exemptions, while religious exemptions were specifically targeted and excluded, does not violate the First Amendment because the two are not comparable. (Gov't Opp'n 11–12.) Justice Alito squarely rejected that contention:

> We also reject the argument that, because the medical exemption is not an "individualized exemption," the *Smith /Lukumi* rule does not apply. While the Supreme Court did speak in terms of "individualized exemptions" in *Smith* and *Lukumi,* **it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection**.

*Fraternal Order of Police*, 170 F.3d at 365 (emphasis added) (cleaned up). The same is true here. Maine maintained a policy that permitted religious exemptions and medical exemptions to mandatory vaccinations. (V. Compl. ¶ 48.) Then, Maine specifically removed religious exemptions while maintaining medical exemptions. (V. Compl. ¶¶ 46–47.) And, under *Fraternal Order of Police*, that discriminatory removal of a religious exemption while maintaining a medical exemption violates the First Amendment. 170 F.3d at 365 ("**Therefore, we conclude that the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi*.**" (emphasis added)).

Here, Maine claims secular, medical reasons for declining vaccination are important enough to overcome its interest in ensuring high vaccination rates but that religious reasons for declining vaccination are not. (Gov't Opp'n 12.) The Third Circuit, however, concluded such a value judgment does not legitimize a discriminatory policy:

> **[T]he medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not. As discussed above, when the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.**

170 F.3d at 366 (emphasis added). Essentially, as here, "**[w]e thus conclude that the Department's policy cannot survive any degree of heightened scrutiny and thus cannot be sustained.**" *Id.* at 367 (emphasis added).

Justice Alito's opinion for the court in *Fraternal Order of Police* hardly represents a novel proposition. As the Sixth Circuit explained, "**a double standard is not a neutral standard**." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) (emphasis added). And, as many courts have recognized, allowing medical exemptions while prohibiting religious exemptions is unconstitutional. *See, e.g.*, *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165–66 (3d Cir. 2002) ("[I]n situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct."); *Litzman v. N.Y. City Police Dep't*, No. 12 Civ. 4681(HB), 2013 WL 6049066, *3 (S.D.N.Y. Nov. 15, 2013) (holding that a policy that permits medical exemptions but not religious exemptions is neither neutral nor generally applicable and must be subject to strict scrutiny); *Singh v. McHugh*, 185 F.

Supp. 3d 201, 225 (D.D.C. 2016) ("In sum, it is difficult to see how accommodating plaintiff's religious exercise would do greater damage to the Army's compelling interests in uniformity, discipline, credibility, unit cohesion, and training than the tens of thousands of medical shaving profiles the Army has already granted."); *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 607 (W.D. La. 2019) (allowing medical exemptions while precluding religious exemptions removes law from neutrality and general applicability). Maine's discriminatory retention of medical exemptions while excluding religious exemptions must be subjected to, and cannot withstand, strict scrutiny. Put simply, "**restrictions inexplicably applied to one group and exempted from another do little to further [the government's] goals and do much to burden religious freedom**." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020) (emphasis added).

> **C.  Maine's Discriminatory Treatment of Religious Exemptions Is Subject to and Cannot Withstand Strict Scrutiny.**
>
> **1.  Maine's favorable treatment of exemptions posing equal risks, and Maine's questionable risk assumptions undermine its claim of a compelling interest.**
>
> **a.  Maine's favorable treatment of medical exemptions posing risks equal to excluded religious exemptions undermines its compelling interest claim.**

Where, as here, First Amendment rights are at issue, "**the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights**." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (emphasis added). Here, because Maine's Vaccine Mandate and its exclusion of religious exemptions implicate Plaintiffs' First Amendment rights, Maine "must do more than simply posit the existence of the disease sought to be cured. **It must demonstrate that the recited harms are**

**real, not merely conjectural**.” *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993). This is so because “[d]eference to [the government] cannot limit judicial inquiry when First Amendment rights are at stake.” *Landmark Commc’ns, Inc. v. Maine*, 435 U.S. 829, 843 (1978).

To be sure, efforts to contain the spread of a deadly disease are “compelling interests of the highest order.” *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 910 (W.D. Ky. 2020). But Maine’s permitting unvaccinated employees with medical exemptions to continue in their same healthcare positions while claiming unvaccinated employees with religious exemptions would put the entire healthcare system at risk undermines any claim that Maine’s interest is compelling. **If any unvaccinated employees pose a risk to Maine’s healthcare system because they are unvaccinated, then all unvaccinated employees pose the same risk**. Put simply, Maine’s Vaccine Mandate “cannot be regarded as protecting an interest of the highest order . . . **when it leaves appreciable damage to that supposedly vital interest unprohibited**.” *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (emphasis added) (cleaned up). Where, as here (V. Compl. ¶¶ 46–49), the government permits exceptions, the Supreme Court has recognized that such exceptions “can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker.” *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448 (2015) (cleaned up). Indeed, “**[w]here a regulation already provides an exception from the law for a particular group, the government will have a higher burden in showing that the law . . . furthers a compelling interest**.” *McAllen Grave Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (emphasis added).

**b.    Maine's claimed compelling interest is based on questionable risk assumptions as shown by scientific evidence in the Verified Complaint and from the CDC.**

Maine asserts that mandatory vaccination for healthcare workers is supported by a compelling interest because nothing else can protect the healthcare industry and patient health in Maine. (Dkt. 49-4, Shah Decl., ¶¶ 55–56.) Maine claims that vaccines are the only way to prevent the spread of COVID-19, and that unvaccinated individuals are at greater risk of infection from the Delta variant than vaccinated. (*Id.* ¶ 23.) But, as demonstrated in the Verified Complaint,

> A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people **to the same degree as if they were not vaccinated at all**. The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.

(V. Compl. ¶ 79 (quoting Sanjay Mishra, *Evidence mounts that people with breakthrough infections can spread Delta easily*, National Geographic (Aug. 20, 2021), https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily (emphasis added)).) *See also* Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR, https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (last visited Sept. 17, 201) (noting that "**the Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people**" (emphasis added).) Thus, Maine's assumptions of the relative risks of transmission by vaccinated and unvaccinated employees are scientifically questionable, further undermining Maine's claimed compelling interest in mandating vaccination. And, critically, it is the Government's burden to demonstrate the compelling interest. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (""the burdens at the preliminary injunction stage track the burdens at trial.""). Maine has not met that burden here.

9

> **2.    Maine stands <u>alone</u> in its blanket refusal to recognize religious exemptions and cannot demonstrate that lonely position is the least restrictive means to achieve its interest.**

Even assuming *arguendo* that imposing a mandatory COVID-19 vaccination requirement on healthcare workers in Maine while excluding religious exemptions is supported by a compelling government interest, the Vaccine Mandate still fails strict scrutiny because it is not the least restrictive means of achieving the government's interest. As the Supreme Court said in *Tandon*,

> narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. **Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.** Otherwise, precautions that suffice for other activities suffice for religious exercise too.

141 S. Ct. at 1296–97 (emphasis added). Now that New York's unconstitutional exemption regime has been judicially enjoined, every other state has demonstrated that preventing the spread of COVID-19 and encouraging vaccination of patient-facing healthcare workers can still be achieved while protecting the sincerely held religious beliefs of conscientious objectors. **These states have found a way to accommodate religion under the same alternative protective measures Plaintiffs request here.** Maine stands alone in its refusal to recognize this truth.

In fact, despite Maine's contentions that there are no alternatives to a vaccine mandate that prohibits religious exemptions, healthcare providers in Maine (and across the country) are regularly providing religious accommodations to healthcare workers. An employee of the Department of Veterans Affairs at the VA Maine Healthcare System in Augusta was merely required to check a box requesting a religious exemption. employee who is employed as Chief Chaplin of Service at the VA Maine Healthcare System in Augusta notes that the VA "permits and freely grants exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations." (EXHIBIT 1, Employee Witness 1 Decl. ¶ 5.)

This employee was granted an accommodation of wearing a mask while at work, and he is "permitted to carry out [his] duties and responsibilities to the same extent as always," including interacting with patients "both with COVID and without COVID." (*Id.* ¶ 10.)

Another VA employee was likewise given an accommodation in Maine. (EXHIBIT 2, Employee Witness 2 Decl. ¶¶ 2–6.) That employee's experience highlights the dichotomous treatment of healthcare workers in Maine. Her VA exemption allowed her to "continue all of [her] previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to [her] patients," and her accommodation only requires that she wear a mask and submit to testing twice weekly. (*Id.* ¶ 10.) This same employee, however, was also a per diem employee at Eastport Memorial Nursing Home in Maine where she requested a religious accommodation similar to her VA accommodation but was informed that such accommodations were not available under Maine law, and her employment was discriminatorily terminated. (*Id.* ¶ 11.)

The availability and workability of accommodations for patient-facing healthcare workers with sincerely held religious objections to COVID-19 vaccination is evident from sea to shining sea, at large employers and small. (*See* EXHIBITS 3-32 (demonstrating accommodations granted to healthcare employees in Maine, Oregon, California, Washington, New Mexico, Missouri, Texas, Wisconsin, Minnesota, Illinois, Colorado, Michigan, Ohio, Pennsylvania, Delaware, Maryland, and Florida.) Maine's contention that it simply cannot provide any reasonable accommodation to the sincerely held religious beliefs of healthcare workers in Maine is demonstrably false. Indeed, the list of healthcare providers granting exemptions across the country involves (a) top education and research hospitals, including University of Colorado, University of Chicago, University of Maryland, Temple University, (b) some of the largest healthcare providers

in the nation, including Kaiser Permanente, Trinity Health, and Advocate Aurora Healthcare with hundreds of thousands of employees providing patient-facing care and accommodating the subset of those with sincere religious beliefs, and (c) mid-size and smaller healthcare providers that have also readily accommodated patient-facing personnel with sincere religious beliefs. (*See* Exs. 3-32.)

And, this point is critical because the government must show it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). *See also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (same). And the Governor must "show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added), and that "imposing lesser burdens on religious liberty 'would fail to achieve the government's interest, not simply that the chosen route was easier.'" *Agudath Israel*, 983 F.3d at 633 (quoting *McCullen*, 134 S. Ct. at 495). **If 49 other states, the Department of Veterans Affairs, and a who's-who of excellent healthcare providers can accommodate their employees' religious beliefs and still advance their interests in protecting patients, Maine can and must do the same.** Maine has brought forth no record facts to even suggest, let alone prove, that the COVID situation in Maine is so much worse than the rest of the country, to justify its lonesome, draconian approach. In fact, the Governor has admitted quite the opposite.

> **Despite having the oldest median age population in the country, Maine, adjusted for population, ranks third lowest in total number of cases and fourth lowest in number of deaths from COVID-19 from the start of the pandemic, according to the U.S. CDC.**

(*See* dkt. 34-1 at 3, *Mills Administration Provides More Time for Health Care Workers to Meet COVID-19 Vaccination Requirement* (emphasis added).) This is a solution in search of a problem.

Indeed, a VA employee who works 9 miles from Defendant MaineGeneral in Augusta has been given an accommodation, yet Plaintiffs in the same hospital somehow lost their constitutional rights on that short 10-minute drive. If this is "narrow tailoring," that term means nothing.

> **D.    Maine's Reliance on *Jacobson* Is Utterly Misplaced Because It Did Not Involve a First Amendment Challenge, Did Not Involve a State Attempting to Revoke Protections of Federal Law in Violation of the Supremacy Clause, and Was Decided Decades Before Strict Scrutiny Became the Governing Standard.**

Maine largely hangs its entire defense on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), claiming that *Jacobson* provides broad latitude for the State to mandate vaccination. (Gov't Opp'n 8–10.) But, **critically, this case is not about a challenge to vaccine mandates in general and does not even challenge the Governor's authority to issue them. It solely focuses on whether – when a mandate has been issued – the government must still follow federal protections for sincerely held religious beliefs.** *Jacobson* has nothing to say on this issue and is inapposite.

It can hardly be argued that a 1905 case with minimal progeny, and substantial jurisprudential developments arising since its holding was articulated 115 years ago, remains the lodestar for current times. History and the Constitution demand otherwise. Moreover, Maine largely ignores the salient point: ***Jacobson* did not involve a First Amendment challenge, which requires an entirely different analysis.** Plaintiffs' claims against Maine arise under the First Amendment. (V. Compl. ¶¶ 123–139.) *Jacobson* was decided long before the First Amendment even applied to the States, and decades before the Supreme Court would even consider the current tiers of scrutiny in constitutional analysis.

Indeed, the First Amendment's various clauses were not even applicable to the states until decades after *Jacobson* was decided. It would not be until 1940 that the Supreme Court would first

articulate the notion that "[t]he fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause); *see also Gitlow v. New York*, 268 U.S. 652, 666 (1925) (holding, under the doctrine of incorporation, that the Free Speech Clause is applicable as against the States); *Everson v. Bd. of Educ. of Ewing Tp.*, 330 U.S. 1, 16 (1947) (holding, under the doctrine of incorporation, that the Establishment Clause is applicable as against the States). It would be another quarter century before "exacting judicial scrutiny" would even enter the First Amendment lexicon in *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938), another 50 years before the phrase "compelling interest" would be introduced to First Amendment jurisprudence in Justice Frankfurter's concurrence in *Sweezy v. New Hampshire*, 354 U.S. 234, 65 (1957) (Frankfurter, J., concurring), and another 60 years before strict scrutiny would ever be applied in its current form in *Sherbert v. Verner*, 374 U.S. 398 (1963).

Moreover, in recent years there has been a monumental shift in how and when strict scrutiny is mandated. *See, e.g.*, *Blith v. City of Slidell*, 260 F. Supp. 3d 656, 666 (E.D. La. 2017) ("*Reed v. Town of Gilbert* then **worked a sea change in First Amendment law**" (emphasis added)); *see also Wollschlaeger v. Florida*, 848 F.3d 1293, 1332 (11th Cir. 2017) (Tjoflat, J., dissenting) (same); *Pan American v. Municipality of San Juan*, 2018 WL 6503215, *12 (D.P.R. Dec. 10, 2018) (noting that *Reed* "worked a sea change in First Amendment law" (citing *Norton v. City of Springfield*, 806 F3d 411, 412 (7th Cir. 2015) (Easterbrook, J.)).

Simply put, *Jacobson* preceded all of these developments, did not involve the same First Amendment questions at issue here, and could not foresee that jurisprudence would require the current mandate—which discriminatorily targeted and revoked religious exemptions—survive "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 US. 507,

534 (1997). *Jacobson* is therefore unhelpful at best, and utterly inapposite at worst. This is not the first time *Jacobson* has been dusted off to deprive constitutional rights in this pandemic, and those prior efforts were squarely rejected by the Supreme Court numerous times. As Justice Gorsuch pointed out in *Catholic Diocese*, "***Jacobson* hardly supports cutting the Constitution loose during a pandemic. That decision involved an entirely different mode of analysis [and] an entirely different right**." *Catholic Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring). Put simply,

> *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today. **Here, that means strict scrutiny: The First Amendment traditionally requires a State to treat religious exercises at least as well as comparable secular activities unless it can meet the demands of strict scrutiny—showing it has employed the most narrowly tailored means available to satisfy a compelling state interest**.

*Id.* (emphasis added).

Moreover, "[e]ven if judges may impose emergency restrictions on rights that some have found hiding in the Constitution's penumbras, **it does not follow that the same fate should befall the textually explicit right to religious exercise**." *Id.* at 70–71 (emphasis added). Contrary to Maine's contentions, *Jacobson* does not represent some "towering authority that overshadows the Constitution during a pandemic," for the simple reason that the judiciary "may not shelter in place when the Constitution is under attack. Things never go well when [it] do[es]." *Id.* at 71.

In fact, even *Jacobson*'s own language suggests that it is inapplicable to a situation where—as here—the government imposes restrictions that plainly violate the First Amendment:

> we deem it appropriate, in order to prevent misapprehension of our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression.

*Jacobson*, 197 U.S. at 38. "**There is no question, therefore, that even under the plain language of *Jacobson*, a public health measure may violate the Constitution**." *Cnty. of Butler v. Wolf*, 486 F. Supp. 3d 833, 897 (W.D. Pa. 2020) (emphasis added). Where, as here, Maine has purported to completely remove the textual protections of the First Amendment and Title VII for healthcare workers in Maine, there is no dispute that Maine's Vaccine Mandate "regulates [and] prohibits conduct because it is undertaken for religious reasons," *Lukumi*, 508 U.S. at 532, while exempting secular conduct of like kind, and therefore violates the First Amendment "and plainly so." *Maryville Baptist*, 957 F.3d at 613. *Jacobson* simply provides no refuge or escape for Maine, and its discriminatory treatment of fundamental First Amendment rights to religious exercise must be subjected to, and cannot survive, strict scrutiny.

## II. DEFENDANTS' WHOLESALE REJECTION OF RELIGIOUS ACCOMMODATIONS IS PLAINLY INCONSISTENT WITH TITLE VII AND IS THEREFORE NULLIFIED AND SUPERSEDED BY FEDERAL LAW.

### A. Title VII Supersedes Maine's Rule Because Even the Employer Defendants Have Admitted That Title VII's Requirement of Religious Accommodation and Maine's Revocation of Religious Exemptions Are in Conflict and That They Cannot Comply With Both.

Employer Defendants' primary contention concerning their utter refusal to comply with the demands of Title VII is that Maine's revocation of religious exemptions from the COVID-19 Vaccine Mandate are not inconsistent with Title VII, and thus they need not comply. (MaineHealth Opp'n 9; NL Opp'n 7–8). Employer Defendants are wrong. Title VII plainly requires that every employer with over 15 employees (which includes all Employer Defendants (V. Compl. ¶ 171)) **must provide religious accommodations** "unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship." 42 U.S.C. § 2000e(j). *See also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977) ("the employer's statutory obligation to make reasonable

accommodation for the religious observance of its employees, short of incurring an undue hardship, **is clear**" (emphasis added)). Despite that mandate of federal law, Maine has issued a wholesale revocation of religious exemptions and accommodations for healthcare workers and has abolished the entire exemption and accommodation process under Title VII for religious objectors. (V. Compl. ¶ 46 (noting that Maine "eliminate[d] the ability of health care workers in Maine to request and obtain a religious exemption and accommodation from the COVID-19 Vaccine Mandate").) Additionally, Government Defendants made it abundantly clear that "[t]he health care immunization law **has removed the allowance for philosophical and religious exemptions**." (V. Compl. ¶ 49 (quoting Division of Disease Surveillance, *Maine Vaccine Exemption Law Change 2021*, https://www.maine.gov/dhhs/mecdc/infectious-disease/immunization/maine-vaccine-exemption-law-changes.shtml (emphasis added)).)

Thus, Title VII's requirement that employers provide at least a process for seeking an accommodation for an employee's sincerely held religious beliefs, and Maine's refusal to provide such a process, are in direct conflict. Under such a scheme, the Supremacy Clause demands that Defendants comply with Title VII. Where—as here—federal law "imposes restrictions [and] confers rights on private actors," and Maine law "imposes restrictions that conflict with the federal law," "**the federal law takes precedence** and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018) (emphasis added). Employer Defendants take great pains to suggest that Maine's refusal to extend religious protections is not preempted by Title VII's demand that employers provide a reasonable accommodation for religious beliefs. This is incorrect. Title VII supersedes state laws where—as here—"compliance with both federal and state regulations is a physical impossibility." *California Fed. Savings & Loan Assoc. v. Guerra*, 479 U.S. 272, 281 (1987) (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)).

In their Oppositions, Employer Defendants now claim to this Court that it is not impossible for them to comply with both Title VII and Maine's revocation of religious exemptions from the COVID-19 Vaccine Mandate. (*See, e.g.*, NL Opp'n 8–9.) However, Employer Defendants' newly minted contentions are plainly belied by the undisputed facts in the Verified Complaint. As shown there, Employer Defendants made it clear that they could not comply with Title VII because it would violate state law. (*See, e.g.*, V. Compl. ¶ 86 ("I can share MaineHealth's view that **federal law does not supersede state law in this instance**. . . . Requiring MaineHealth to violate state law by granting unrecognized exemptions would impose such a hardship. **As such, we are not able to grant a request for a religious exemption from the state mandated vaccine**."); *id.* ¶ 94 ("Allowing for a religious exemption would be a violation of the state mandate issued by Governor Mills. So, unfortunately, that is not an option for us.").) Thus, Employer Defendants admit that Maine's revocation of a religious exemption is in direct conflict with Title VII and that both cannot be complied with by Employer Defendants.

Employer Defendants' admission is fatal. "**[T]he Supremacy Clause . . . invalidates state laws that interfere with, or are contrary to, federal law. Under the Supremacy Clause . . . state law is nullified to the extent that it actually conflicts with federal law**." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712–13 (1985) (emphasis added) (cleaned up). Employer Defendants admit that compliance with both is impossible, which requires a finding that Title VII supersede Maine's inconsistent and contrary rules. *California Fed. Savings & Loan*, 479 U.S. at 281. Maine's discriminatory revocation of religious exemptions simply does not relieve Employer Defendants of their obligations under Title VII, and the Supremacy Clause demands that Maine provide the protections explicitly provided by Title VII.

**B.      Title VII Explicitly Preempts State Laws, Like Maine's, That Require the Doing of an Act That Is Prohibited by Title VII.**

**Under the plain language of Title VII, Maine's refusal to recognize and accommodate Plaintiffs' sincerely held religious beliefs is preempted and overridden by Title VII.** Indeed,

> Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, **other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter**.

42 U.S.C. § 2000e-7 (emphasis added). Thus, because Maine's rule revoking religious exemptions and accommodations "purports to require" discrimination on the basis of religion, and purports to abolish the exemption and accommodation procedure explicitly provided in Title VII, each of which are "an unlawful employment practice" under Title VII, *see* 42 U.S.C. §2000e-2(a), Maine's rules are superseded and preempted by Title VII.

In addition to the explicit textual preemption of Title VII, abundant precedent demonstrates that Maine cannot require employers to engage in a practice that is unlawful under Title VII. *See, e.g.*, *Coalition for Economic Equality v. Wilson*, 122 F.3d 692, 710 (9th Cir. 1997) (noting that Title VII preempts state laws that "purport to require the doing of any act which would be an unlawful employment practice under Title VII"); *Brown v. City of Chicago*, 8 F. Supp. 2d 1095, 1112 (N.D. Ill. 1998) (noting that Congress "'intended to supercede [*sic*] all provisions of State law which require or permit the performance of an act which can be determined to constitute an unlawful employment practice under the terms of Title VII of the Act or are inconsistent with any of its purposes'" (quoting *Rinehart v. Westinghouse Elec. Corp.*, No. C 70-537, 1971 WL 174, *2 (N.D. Ohio Aug. 20, 1971)); *LeBlanc v. S. Bell Tel. & Tel. Co.*, 333 F. Supp. 602, 608 (E.D. La. 1971) (noting that Louisiana's employment law provisions that conflict with Title VII "are invalid under the Supremacy Clause"). Moreover, Employer Defendants are not permitted to rely upon

19

Maine's revocation of protections for religious objectors as a defense to refusing to do what Title VII requires. *See, e.g.*, *Guardians Ass'n v. Civil Serv. Comm.*, 630 F.2d 79, 104–105 (2d Cir. 1980) ("Nor can the City justify the use of rank-ordering by reliance on what it contends are requirements of state law. Title VII explicitly relieves employers from any duty to observe a state hiring provision "which purports to require or permit" any discriminatory employment practice." (citation omitted)).

## III.   DEFENDANTS' FALSE REDUCTION THAT PLAINTIFFS' HARM IS COMPENSABLE AS A MERE EMPLOYMENT MATTER PLAINLY IGNORES THE BLATANT FIRST AMENDMENT INJURY BEING IMPOSED ON THEM EACH AND EVERY DAY, WHICH IS PER SE IRREPARABLE HARM.

Defendants devote much ink to the notion that Plaintiffs cannot show irreparable harm because they can be reinstated to their jobs and given remuneration for lost wages. (MaineHealth Opp'n 17–18; NL Opp'n 13–15.) While it is generally true that a loss of employment does not constitute irreparable harm, **that ignores the seminal First Amendment questions before the Court**. And there can be no dispute that Government Defendants' substantial burden on Plaintiffs' religious exercise constitutes irreparable harm as a matter of law. As the Supreme Court has held time and again, Plaintiffs "are irreparably harmed by the loss of free exercise rights for even minimal periods of time." *Tandon*, 141 S. Ct. at 1297. Indeed, "**[t]here can be no question that the challenged [mandate], if enforced, will cause irreparable harm**." *Catholic Diocese*, 141 S. Ct. at 67 (emphasis added). Contrary to Defendants' assertions, Plaintiffs' constitutional injuries in the instant matter are presumed irreparable harm under binding law. *See, e.g.*, *Sindicator Puertorriqueno de Trabajaddores v. Fortuno*, 699 F.3d 1, 11 (1sr Cir. 2012) ("irreparable injury is presumed" in First Amendment cases). Put simply, "a violation of plaintiffs' constitutional right, and in particular, a violation of First Amendment rights, constitutes irreparable harm, *per se*." *Westchester Legal Servs., Inc. v. Westchester Cnty.*, 607 F. Supp. 1379, 1385 (S.D.N.Y. 1985).

Defendants' collective false reduction, that Plaintiffs face only the loss of a job rather than the unconscionable loss of First Amendment rights at the hand of Government Defendants, must be rejected. The impact of Maine's far-reaching mandate cannot be understated. Plaintiffs cannot simply go from one employer who unlawfully discriminates, and get a job at a different employer to feed their families while their legal claims are pending. Maine has essentially ensured the Plaintiffs **cannot work anywhere in the entire State**. If that's not irreparable harm, the word has no meaning. Indeed, "**[t]he harm [Plaintiffs] would suffer is not only, as [Defendants] argue[], the loss of [their] job[s] *per se*, but also the penalty for exercising [their First Amendment] rights. The chilling effect of that penalty cannot be adequately redressed after the fact**." *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987) (emphasis added); *see also Gardner v. Larkin*, No. 19-139JJM, 2019 WL 6337686, *3 (D.R.I. Nov. 27, 2019) (same). Binding precedent demands that Defendants' false reduction be rejected and Plaintiffs awarded immediate injunctive relief to remedy their present and ongoing loss of First Amendment rights.

## CONCLUSION

Because Government Defendants' revocation of religious exemptions from the COVID-19 Vaccine Mandate is neither neutral nor generally applicable, and because adequate, less restrictive alternatives are available to Defendants, Plaintiffs are likely to succeed on the merits of their claim. The preliminary injunction should issue immediately.

21

Respectfully submitted,

/s/ Stephen C. Whiting
Stephen C. Whiting
     ME Bar No. 559
The Whiting Law Firm
75 Pearl Street, Suite 207
Portland, ME 04101
(207) 780-0681
Email: steve@whitinglawfirm.com

/s/ Daniel J. Schmid
Mathew D. Staver*
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org
*Admitted pro hac vice

***Attorneys for Plaintiffs***

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of September, 2021, I caused a true and correct copy

of the foregoing to be electronically filed with this Court. Service will be effectuated on all Counsel

of Record via this Court's ECF/electronic notification system.

/s/ Daniel J. Schmid
Daniel J. Schmid