## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JANE DOES 1-6 et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) 1:21-cv-00242-JDL |
| | ) |
| JANET T. MILLS, in Her Official | ) |
| Capacity as Governor of the | ) |
| State of Maine, et al., | ) |
| | ) |
| Defendants. | ) |

### ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Plaintiffs, eight individual healthcare workers and one individual healthcare provider, seek a preliminary injunction (ECF No. 3) prohibiting Janet T. Mills, Maine's Governor, and other named defendants from requiring all employees of designated healthcare facilities to be vaccinated against the SARS-CoV-2 coronavirus—the cause of COVID-19 infections—through the enforcement of the rule, Immunization Requirements for Healthcare Workers, 10-144-264 Me. Code R. §§ 1-7 (2021)[1] (the "Rule"), as amended August 12, 2021.  The Plaintiffs contend that the vaccination requirement violates their First Amendment and other federal constitutional and statutory rights because it does not exempt from its requirements individuals whose sincerely held religious beliefs cause them to object to being

---

[1]  The Rule can be found at https://www.maine.gov/dhhs/mecdc/rules/maine-cdc-rules.shtml (perma.cc/R3UM-ZBN3) (navigate to the text of the Rule by selecting "Emergency," and then choosing "Emergency Rulemaking: 10-144 CMR Ch. 264 – Immunization Requirements for Healthcare Workers.").

vaccinated against COVID-19.  Seven of the nine plaintiffs also contend that their employers violated federal employment law by refusing to grant them a religious exemption from the vaccination requirement.

The Plaintiffs' five-count Complaint (ECF No. 1) names as defendants, in their official capacities, Governor Mills; Dr. Nirav D. Shah, the Director of Maine CDC; and Jeanne M. Lambrew, the Commissioner of the Maine Department of Health and Human Services ("DHHS") (the "State Defendants").  The Complaint also names five incorporated entities that operate healthcare facilities in Maine: Defendants Genesis Healthcare of Maine, LLC; Genesis Healthcare, LLC; Northern Light Health Foundation; MaineHealth; and MaineGeneral Health (the "Hospital Defendants").

The Rule requires all employees of designated healthcare facilities[2] to receive their final dose of the vaccination against the SARS-CoV-2 coronavirus by September 17, 2021.  10-144-264 Me. Code R. § 5(A)(7) (effective Aug. 12, 2021).  On September 2, 2021, the DHHS and Maine CDC announced that they would not begin enforcing the Rule's provisions until October 29, 2021, to allow additional time for employees of designated healthcare facilities to comply with the Rule by receiving their final vaccine dose by October 15.  ECF No. 49-5 at ¶ 37.  If granted, the preliminary

---

[2]  Under the Rule, designated healthcare facility "means a licensed nursing facility, residential care facility, Intermediate Care Facility for Individuals with Intellectual Disabilities (ICF/IID), multi-level healthcare facility, hospital, or home health agency subject to licensure by the State of Maine, Department of Health and Human Services Division of Licensing and Certification."  The Rule also applies to dental health practices (where dentists and/or dental hygienists provide oral health care) and to Emergency Medical Services operations.  10-144-264 Me. Code R. § 1(D), (E), (H) (Aug. 12, 2021).  All references to "designated healthcare facilities" in this Order include all of the entities subject to the Rule's requirements.

injunction would prohibit the Defendants from enforcing the Rule or terminating the Plaintiffs' employment based on their refusal to be vaccinated against COVID-19.

A hearing on the Motion for Preliminary Injunction was held on September 20, 2021.[3]  After careful consideration and for the reasons that follow, I deny the Plaintiffs' motion.  (ECF No 3).

## II.  BACKGROUND

The parties have filed declarations and various exhibits in support of their positions.  Except where otherwise noted, I have based my findings on these documents.[4]  Additionally, I take judicial notice of certain additional facts pertinent to the Motion.  *See In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003) (noting that although a district court is generally limited to examining the record, it may also consider "the documents incorporated by reference in it, matters of public record, and other matters susceptible to judicial notice");  *see also Loucka v. Lincoln Nat'l Life Ins. Co.,* 334 F. Supp. 3d 1, 8-9 (D.D.C. 2018) ("[T]he CDC's Lyme-testing criteria and procedures are a matter of public record, and it cannot be reasonably questioned that the agency's website is an accurate source for those standards.").

---

[3] The Plaintiffs' Motion also included a request for an ex parte temporary restraining order to the same effect.  On August 26, 2021, after a conference with the Plaintiffs' counsel, I denied that portion of the Motion (ECF No. 11), concluding that the Plaintiffs had not satisfied the requirements of Federal Rule of Civil Procedure 65(b)(1) for a temporary restraining order without providing notice to the Defendants.

[4] The bulk of my findings regarding the COVID-19 pandemic and the State's response are derived from the Declaration of Dr. Nirav D. Shah, Director of Maine CDC, (ECF No. 49-4) and the Declaration of Sara Gagné-Holmes, Deputy Commissioner of the DHHS (ECF No. 49-5).  The Plaintiffs have not submitted declarations that dispute the factual assertions made in the Shah and Gagné-Holmes declarations.

To provide the necessary background, I begin by addressing: (A) COVID-19 and Maine's response; (B) the asserted religious beliefs that cause Plaintiffs to refuse to be vaccinated against COVID-19; and (C) the origin of the emergency rulemaking that required that healthcare workers be vaccinated against COVID-19.

## A.    The COVID-19 Global Pandemic

COVID-19 is a highly contagious disease that can cause serious illness and death.  ECF No. 49-4 at ¶¶ 11, 13, 15.  In March 2020, the World Health Organization declared COVID-19 to be a global pandemic.  ECF No. 49-4 at ¶ 12.  As of September 12, 2021, there were approximately 219 million cases of COVID-19 worldwide.  ECF No. 49-4 at ¶ 13.  Globally, over 4,550,000 people have died from COVID-19, including approximately 660,000 deaths in the United States.  ECF No. 49-4 at ¶ 13.  As of September 14, 2021, Maine had 81,177 total cases of COVID-19, with 969 deaths. ECF No. 49-4 at ¶ 14.

Variants of the virus have emerged over the course of the pandemic.  ECF No. 49-4 at ¶ 20.  The Delta variant, which is now the predominant variant of all COVID-19 cases in the United States, ECF No. 49-4 at ¶ 50, is more than twice as contagious as previous variants, ECF No. 49-4 at ¶ 22.  As of August 27, 2021, the Delta variant accounted for 96.7% of all positive COVID-19 samples sequenced in Maine.  ECF No. 49-4 at ¶ 50.  A higher level of contagiousness necessitates a correspondingly higher vaccination rate among the public to achieve "herd immunity."[5]  ECF No. 49-4 at

---

[5] Herd immunity refers to the population-level phenomenon whereby the community is sufficiently populated with vaccinated individuals that unvaccinated individuals can enjoy a substantially lessened risk of exposure and, therefore, of infection, as the vaccinated individuals block the virus from spreading from person to person.  ECF No. 49-4 at ¶¶ 27-28.

¶ 28.   With the emergence of the Delta variant, epidemiological models have increased the projected vaccination rate needed to achieve herd immunity from 70% to 90%.  ECF No. 49-4 at ¶ 29.

Three COVID-19 vaccines are generally available: Pfizer-BioNTech (the "Pfizer vaccine"), Moderna, and Janssen (the "J&J vaccine").  ECF No. 49-4 at ¶ 40. All three are effective against the Delta variant.  ECF No. 49-4 at ¶ 43.  Prior to their availability, the United States Centers for Disease Control and Prevention ("CDC") and Maine CDC recommended that people wear face coverings and practice physical distancing to limit the spread of the virus.  ECF No. 49-5 at ¶ 5.  Once the first vaccine doses became available in December 2020, Maine CDC prioritized the vaccination of frontline healthcare professionals and patient-facing staff through its eligibility guidelines.  ECF No. 49-5 at ¶¶ 15-18.  The vaccines are now widely available, and the State has worked in parallel with hospital systems to encourage and facilitate the widespread vaccination of Maine residents.  ECF No. 49-5 at ¶¶ 19(f), 23-29.

The Rule was amended in August 2021 to add COVID-19 to the list of infectious diseases for which vaccinations are mandated for employees of designated healthcare facilities.  It represented the latest in a series of measures employed by the State to combat the COVID-19 pandemic in healthcare settings.  When formulating the amendment, Maine CDC reviewed and considered alternatives to mandating vaccinations, including the measures then being employed by Maine healthcare facilities, such as twice-weekly or daily testing, symptom monitoring, and the use of personal protective equipment ("PPE").  ECF No. 49-4 at ¶¶ 59-64.  Maine CDC rejected twice-weekly testing as inadequate given the speed at which the Delta

variant is transmitted—a person infected with the Delta variant can transmit the infection to others within just 24 to 36 hours of exposure.  ECF No. 49-4 at ¶¶ 25, 61.  Similarly, Maine CDC rejected daily antigen testing as insufficient because the most effective tests (polymerase-chain-reaction tests ("PCR")) require 24 to 72 hours to produce results and the faster rapid-antigen tests are too inaccurate and in short supply.  ECF No. 49-4 at ¶ 62.  Symptom monitoring as a standalone measure was rejected because the virus can be transmitted by persons who are asymptomatic.  ECF No. 49-4 at ¶ 60.  Similarly, sole reliance on the use of PPE was rejected because, even if worn correctly, PPE will not stop the spread of COVID-19 in healthcare settings.  ECF No. 49-4 at ¶ 64.

Healthcare facilities throughout Maine have used a combination of the preceding measures to control the COVID-19 virus since the beginning of the pandemic; nonetheless, they have been the sites of numerous outbreaks of the virus.  ECF No. 49-4 at ¶ 65.  The number of outbreaks at designated healthcare facilities rose substantially from early August to early September 2021, notwithstanding the fact that the hospitals where the outbreaks occurred had strong infection control programs in place.  ECF No. 49-4 at ¶¶ 46-47.  Most of the healthcare facility outbreaks resulted from infected healthcare workers bringing COVID-19 into the facility.  ECF No. 49-4 at ¶ 48.

## B.    The Plaintiffs' Objection to the COVID-19 Vaccines

The Plaintiffs are nine individuals who are identified in the Complaint by pseudonyms.  The Complaint alleges that Jane Does 1 through 5 and John Does 2 and 3 are healthcare workers employed by the Hospital Defendants.  John Doe 1 is a

licensed healthcare provider who operates his own practice. Jane Doe 6 is a healthcare worker employed by John Doe 1.[6, 7]

The Plaintiffs object to receiving the COVID-19 vaccines based on their stated belief that "life is sacred from the moment of conception[.]" ECF No. 1 at ¶ 54. They contend that the development of the three COVID-19 vaccines employed or benefitted from the cell lines of aborted fetuses. Specifically, the Plaintiffs object to the Moderna and Pfizer vaccines because both are mRNA vaccines which, the Plaintiffs claim, "have their origins in research on aborted fetal cells lines." ECF No. 1 at ¶ 65.

---

[6] The Complaint alleges the following facts regarding the Plaintiffs:

Plaintiff Jane Doe 1 is a Maine resident and healthcare worker employed by a healthcare facility operated by Defendant MaineHealth in Maine. She submitted a written request for a religious exemption from the vaccine mandate to her employer, which was denied.

Plaintiff John Doe 1 is a licensed healthcare provider who operates a designated healthcare facility in Maine. The Complaint alleges that he and his employees have sincerely held religious objections to receiving the COVID-19 vaccine, and that he faces the closure of his practice and loss of his business license should he consider or grant religious exemptions to the vaccine mandate to his employees.

Plaintiff Jane Doe 6 is a healthcare worker employed by John Doe 1. The Complaint is unclear as to whether she has requested a religious exemption to the mandate from her employer, John Doe 1.

Plaintiffs Jane Doe 2 and John Doe 2 are both Maine residents and healthcare workers employed by healthcare facilities operated by Defendant Genesis Healthcare in Maine. Both submitted written requests for religious exemptions from the vaccine mandate, and Genesis Healthcare denied them. Jane Doe 2 was given until August 23, 2021 to receive the vaccination and alleges that she was terminated from her employment for failure to meet this deadline.

Plaintiffs Jane Does 3 and 4 and John Doe 3 are Maine residents and healthcare workers employed by healthcare facilities operated by Defendant Northern Light Health Foundation in Maine. Each submitted written requests for religious exemptions from the vaccine mandate, and each request was denied.

Plaintiff Jane Doe 5 is a Maine resident and healthcare worker employed by a healthcare facility operated by Defendant MaineGeneral Health in Maine. She submitted a written request for a religious exemption from the vaccine mandate to her employer, which was denied.

[7] The Complaint also names Plaintiffs Jack Does 1 through 1000 and Joan Does 1 through 1000 as putative plaintiffs who have not yet been joined in the action.

Plaintiffs also object to the J&J vaccine, asserting that aborted fetal cell lines were used in both its development and production.  They allege that the use of fetal cell lines to develop the vaccines runs counter to their sincerely held religious beliefs that cause them to oppose abortion.

In their responses to the Plaintiffs' motion seeking preliminary injunctive relief, the Defendants have not challenged the sincerity of the Plaintiffs' asserted religious beliefs or that those beliefs are the reason for the Plaintiffs' refusal to be vaccinated.  I therefore treat these facts as established for purposes of deciding the Preliminary Injunction Motion.[8]

## C.   The COVID-19 Vaccine Mandate

Mandatory vaccination requirements for healthcare workers in Maine were established long before the emergence of COVID-19 in late 2019.  Since 1989, Maine has required by statute that hospitals and other healthcare facilities ensure that their employees are vaccinated against certain communicable diseases.  1989 Me. Legis. Serv. 641 (West).  When the statute, 22 M.R.S.A. § 802 (1989), was first enacted, it required vaccinations for measles and rubella.  Its stated purpose was to report, prevent, and control infectious diseases that pose a potential public health threat to the people of Maine.  *Id*. § 802(1)(D) (1989).

The ensuing years witnessed the development of new vaccines and vaccine recommendations, resulting in frequent revisions to the statute.  In response, the

---

[8] Pursuant to the Court's scheduling order entered on September 2, 2021 (ECF No. 35), the deadline for the Defendants' answers to the Complaint will be set once the Court has entered an order on the Motion for Preliminary Injunction and the period for filing an interlocutory appeal of that order has expired or, if an interlocutory appeal is filed, the appeal has been finally determined.  As a result, the Defendants have not yet filed answers to the Complaint.

statute was again amended in 2001 to delegate to DHHS the authority, by rulemaking, to designate mandatory vaccines for healthcare workers at designated healthcare facilities and for school children.   2001 Me. Legis. Serv. 147 (West). Accordingly, in 2002 DHHS promulgated and first adopted the rule entitled "Immunization Requirements for Healthcare Workers," which is the Rule at issue here.   10-144-264 Me. Code R. §§ 1-7 (Apr. 16, 2002).   At its adoption, the Rule required vaccinations for measles, rubella, hepatitis B, mumps, and chickenpox.   *Id*. at § 5(A).

From 2001 until 2019, the statute contained three exemptions from the vaccination requirements for both Maine healthcare workers and school children: a "medical exemption" for those who provided "a physician's written statement that immunization against one or more diseases may be medically inadvisable," and both "religious [and] philosophical exemption[s]" for those "who state[d] in writing a sincere religious or philosophical belief that is contrary to the immunization requirement."   22 M.R.S.A. § 802(4-B)(A), (B) (2019).   In 2019, the Maine Legislature enacted legislation repealing the exemptions for religious and philosophical beliefs, 2019 Me. Legis. Serv. 386 (West), thus leaving the medical exemption as the sole exemption permitted under law.   In response to this legislative change, a statewide veto referendum regarding the new law eliminating the religious and philosophical exemptions was held in March 2020 pursuant to the People's Veto provision of the Maine Constitution, Me. Const. art. IV, pt. III, § 17.   The law was upheld, with over

72% of voters voting in favor of it.[9]  In April 2021, DHHS amended the Rule by, among other things, removing the provision describing the permissible exemptions and referring back to the statute which lists medical exemptions as the sole category of exemption.  *See* 10-144-264 Me. Code R. § 3 (effective Apr. 14, 2021); 22 M.R.S.A. § 802(4-B)(B).[10]  In August 2021, DHHS promulgated the current version of the Rule by adding the COVID-19 vaccination to the list of required vaccinations and also adding dental practices and emergency services organizations as enumerated designated healthcare facilities subject to the Rule's requirements.  10-144 C.M.R. Me. Code R. § 1 (effective Aug. 12, 2021).  The Plaintiffs do not challenge the lawfulness of the rulemaking process by which the current version of the Rule was adopted.

The preceding history demonstrates that although Plaintiffs' arguments are directed at the amendment of the Rule in August 2021 and the Rule's failure to include a religious exemption from the COVID-19 vaccination requirement, it was the Legislature's revision of the statute in 2019 which eliminated the religious exemption for all mandatory vaccines.  Therefore, when I refer in this decision to the COVID-19 vaccine mandate, I am referring to the Rule as it operates in conjunction with the statute, 22 M.R.S.A. § 802(4-B), which authorizes it.

---

[9] Full results are available on the Maine Secretary of State website.  Dep't of Sec'y of State, State of Maine, Tabulations for Elections Held in 2020, https://www.maine.gov/sos/cec/elec/results/results20.html#ref20 (last visited Oct. 10, 2021) (to calculate the percentage, select "March 3, 2020 Special Referendum Election" to access the spreadsheet of results.  Then divide the number of "no" votes (281,750) by the total number of votes cast (388,393).

[10] There is an additional exemption provided specifically for the Hepatis B vaccine, as mandated under Federal Law, 22 M.R.S.A. § 802(4-B)(C), which is distinct and not relevant to the inquiry at hand.

Having provided the necessary background, I turn to the legal standard which would govern the award of a preliminary injunction.

### III.  PRELIMINARY INJUNCTION LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy . . . that is never awarded as of right.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

A trial court must consider four factors when assessing a request for a preliminary injunction: (1) likelihood of success on the merits, (2) whether, absent preliminary relief, the plaintiff will suffer irreparable harm, (3) whether "the balance of equities tips in [the plaintiff's] favor," and (4) whether granting the injunction serves the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Of these factors, "[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).  This first factor is so consequential that "[i]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Me. Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

At this preliminary stage, the court "need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Ryan*, 974 F.3d at 18.

## IV.  LEGAL ANALYSIS

The Plaintiffs' Complaint presents five claims arising under: (A) the Free Exercise Clause of the First Amendment; (B) Title VII, 42 U.S.C.A. § 2000e to e-17 (West 2021); (C) the Equal Protection Clause of the Fourteenth Amendment; (D) a claim of Conspiracy in violation of 42 U.S.C.A. § 1985 (West 2021); and (E) the Supremacy Clause.  As will become apparent, the likelihood of the Plaintiffs' success on their Free Exercise claim largely controls the outcome as to the remaining claims for purposes of determining the Plaintiffs' entitlement to preliminary injunctive relief.

### A.    The Free Exercise of Religion

The Free Exercise Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, provides that "Congress shall make no law prohibiting the free exercise" of religion.  U.S. Const. amend. I, *see Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) (incorporating the Free Exercise Clause of the First Amendment against the states).  The clause "embraces two concepts[:] freedom to believe and freedom to act."  *Cantwell*, 310 U.S. at 303.  Although the freedom to believe is absolute, the freedom to act on one's religious beliefs "remains subject to regulation for the protection of society."  *Id.* at 304.

The Constitution's Free Exercise Clause does not prevent states from enacting a "neutral, generally applicable regulatory law," even when that law infringes on religious practices.  *See Emp. Div., Dep't of Hum. Res. of Or. V. Smith*, 494 U.S. 872, 879-882 (1990).  Laws that are deemed both neutral and generally applicable are traditionally subject to rational basis review.  Thus, in *Smith*, the U.S. Supreme

Court explained: "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.  On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition."  *Id*. at 878-79.  Further, "if prohibiting the exercise of religion . . . is not the object of the [state action] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."[11]  *Id*. at 878.  However, if a law burdens a religious practice and does not satisfy the requirements of neutrality and general applicability, the law is invalid under the Free Exercise Clause unless it survives strict scrutiny, meaning it is "justified by a compelling governmental interest and . . . narrowly tailored to advance that interest."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993).

The parties' dispute under the Free Exercise Clause centers on the standard of constitutional review that applies: rational basis review or strict scrutiny review.  The Plaintiffs argue that the COVID-19 vaccine mandate's failure to provide a religious exemption means that the regulation is not neutral and generally applicable and,

---

[11]  Writing for the Court's majority in *Smith*, Justice Scalia reasoned that the question of whether a religious exemption or accommodation should be adopted as part of a neutral, generally applicable regulatory law is not within the purview of the courts' role in enforcing the Free Exercise Clause but is instead for the other branches of government to determine:

> But to say that a nondiscriminatory religious-practice exemption is permitted [by the Free Exercise Clause], or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts.  It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs.

therefore, must be analyzed under the more demanding strict scrutiny standard.  The Defendants disagree, contending that the mandate is neutral and generally applicable notwithstanding the lack of religious exemption, and that the more deferential rational basis standard of review applies.

Under rational basis review, "a neutral, generally applicable regulatory law that compel[s] activity forbidden by an individual's religion" withstands a Free Exercise challenge if there is a rational basis for the regulation.  *Smith*, 494 U.S. at 880.  Applying rational basis review to the COVID-19 vaccine mandate at issue here would be in keeping with the Supreme Court's foundational decision in the area of mandatory vaccines—*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)—in which the Court upheld the constitutionality of a state mandated smallpox vaccine.  In so doing, the Court applied a deferential standard of review and rejected a Fourteenth Amendment substantive due process challenge to the law, concluding that the mandatory vaccination law was constitutional because it had a "real [and] substantial relation to the protection of the public health and the public safety."[12]  *Id.* at 31.

---

[12] The Plaintiffs argue that because *Jacobson* pre-dates both the application of the Free Exercise Clause to the states and the Court's adoption of the tiers of scrutiny for constitutional questions, it is inapposite.  The Defendants do not solely rest their argument on *Jacobson* but they do argue that it supports the more general proposition that a state may mandate vaccinations and need not include religious exemptions when doing so.

In the years since the Supreme Court recognized that the First Amendment's Free Exercise Clause applies to the states, *Jacobson* has been treated as informative authority both regarding the scope of government power to enact mandatory vaccination requirements to protect public health and for the proposition that the Constitution does not require religious exemptions from state-mandated vaccinations.  *See, e.g., Zucht v. King*, 260 U.S. 174, 176 (1922) (affirming that *Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination"); *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause"); *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) ("[Plaintiff] has not been denied any legal right on the basis of her religion.  Constitutionally, [plaintiff]

However, *Jacobson* did not specifically address the scope of an individual's constitutional rights under the First Amendment's Free Exercise Clause in relation to mandatory vaccines, and that inquiry is the crux of the dispute here.

Under strict scrutiny review, a challenged government action may be upheld only if "it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296-97 (2021) (per curiam). The government must also demonstrate that it "seriously undertook to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

---

has no right to a [vaccine] exemption."); *Workman v. Mingo Cnty. Bd. Of Educ.*, 419 Fed. App'x 348, 352-54 (4th Cir. 2011) (relying on the *Jacobson*, *Zucht*, and *Prince* line of cases to hold that a state mandatory vaccination law that allowed medical but not religious exemptions was constitutional); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1084, 1086 (S.D. Cal. 2016) ("[I]t is clear that the Constitution does not require the provision of a religious exemption to vaccination requirements" because, "[a]s stated in *Prince*, the right to free exercise does not outweigh the State's interest in public health and safety."); *Klaassen v. Trs. Of Ind. Univ.*, No. 1:21-CV-238, 2021 WL 3073926, at *17-22, *39 (N.D. Ind. July 18, 2021) (providing a detailed analysis of *Jacobson's* continued viability and noting that "courts have consistently held that schools that provided a religious exemption from mandatory vaccination requirements did so *above and beyond* that mandated by the Constitution"), *aff'd*, 7 F.4th 592 (7th Cir. 2021) (relying on *Jacobson* to hold that "there can't be a constitutional problem with vaccination against SARS-CoV-2" because, although *Jacobson* has been criticized, "a court of appeals must apply the law established by the Supreme Court"); *Boone v. Boozman*, 217 F. Supp. 2d 938, 954 (E.D. Ark. 2002) ("The constitutionally-protected free exercise of religion does not excuse an individual from compulsory immunization; in this instance, the right to free exercise of religion . . . [is] subordinated to society's interest in protecting against the spread of disease."); *Harris v. Univ. of Mass., Lowell*, No. 21-cv-11244, 2021 WL 3848012, at *7 (D. Mass. Aug. 27, 2021) (following the *Jacobson* line to hold that "UMass is under no constitutional obligation to offer a religious exemption to its Vaccine Requirement.").

To determine whether rational basis or strict scrutiny review applies, I turn to consider whether the COVID-19 vaccine mandate is both (1) neutral, and (2) generally applicable.

### 1. Neutrality

Neutrality examines whether the State's object, or purpose, was to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. A law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." *Id*. The first step in determining the object of a law is to examine whether it is facially neutral. *Id*. ("[T]he minimum requirement of neutrality is that a law not discriminate on its face.").

By this standard, the COVID-19 vaccine mandate challenged here is facially neutral. Neither the applicable statute nor the Rule mention religion, even by implication. Operating in tandem, they require that all healthcare workers employed at designated healthcare facilities receive the COVID-19 vaccination. They do not treat the COVID-19 vaccine differently than any other vaccinations mandated under Maine law.

The vaccine mandate's facial neutrality is not dispositive, though, because the "[g]overnment [also] fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Thus, even a facially neutral law may not be neutral for Free Exercise purposes if its object is to discriminate against religious beliefs, practices, or motivations. *Lukumi*, 508 U.S. at 534 ("The Free

Exercise Clause protects against governmental hostility, which is masked, as well as overt.").

The Plaintiffs contend that the COVID-19 vaccine mandate is not neutral because the removal of the religious exemption from the Rule "specifically target[ed] Plaintiffs' religious beliefs for disparate and discriminatory treatment." ECF No. 1 ¶ 131. They assert that "Maine has plainly singled out religious employees who decline vaccination for especially harsh treatment (i.e., depriving them from earning a living anywhere in the State), while favoring employees declining vaccination for secular, medical reasons." ECF No. 57 at 4. This argument mirrors claims made recently by healthcare providers challenging New York's COVID-19 vaccine mandate, which also did not provide for religious exemptions. *Dr. A. v. Hochul*, No. 1:21-cv-1009, at **4-6 (N.D.N.Y. Oct. 12, 2021). However, the challenged New York regulation is distinguishable from Maine's COVID-19 vaccine mandate, because the New York regulation originally provided for a religious exemption which was then removed only a few days before the requirement became effective; additionally, New York provides religious exemptions to other mandated vaccinations for healthcare workers. *Id.* at *4, *5, *16 n.9. For these reasons, the court determined that the intentional, last-minute change to the language in the New York regulation was a "religious gerrymander" that required strict scrutiny. *Id.* at *19. In contrast, the Maine Legislature removed the religious exemption as to all mandated vaccines by amending 22 M.R.S.A. § 802(4-B) in 2019. Following the unsuccessful People's Veto held in 2020, DHHS removed the religious exemption from the Rule in April 2021 to conform the Rule to the 2019 statutory change. This revision pre-dated the COVID-

19 vaccine requirement and served to ensure that the Rule was consistent with Maine law. The history associated with the revision of the Rule does not demonstrate animus toward religion.

In support of their argument, the Plaintiffs cite to a trio of recent per curiam or memorandum decisions issued by the U.S. Supreme Court: *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 62 (2020) (per curiam); *South Bay Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (mem.); and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam). Each involved a challenge to a state law aimed at quelling the spread of COVID-19. Each was issued in response to a motion for emergency injunctive relief to preserve the status quo pending resolution of appellate review. Of the three, the Plaintiffs rest primarily on *Tandon v. Newsom*.

In *Tandon*, the Supreme Court granted injunctive relief against enforcement of a California regulation that prohibited indoor private gatherings of more than three households during the COVID-19 pandemic. 141 S. Ct. at 1297. The prohibition had the effect of restricting at-home religious gatherings while allowing groups of more than three households to gather in public settings, such as hair salons, retail stores, and restaurants. *Id*. In enjoining the regulation's enforcement, the Court explained that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id*. at 1296. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id*. "Comparability is concerned with the risks

various activities pose, not the reasons" motivating the activities. *Id.* The Court's majority concluded that private indoor gatherings of three or more households were comparable to groups of the same or a greater number of households in public businesses, which were not prohibited by the regulation, and granted an injunction against the policy's enforcement pending appellate review. *Id.* at 1297.

Citing *Tandon,* the Plaintiffs argue that the Free Exercise Clause prohibits the treatment of "**any** secular activity more favorably than religious activity." ECF No. 57 at 3 (emphasis in original). This misstates *Tandon*'s holding because it omits the crucial modifier—"comparable"—from the analysis of whether a secular activity has been treated more favorably than a religious activity.

In the unique context of a vaccine mandate intended to protect public health, there is a fundamental difference between a medical exemption—which is integral to achieving the public health aims of the mandate—and exemptions based on religious or philosophical objections—which are unrelated to the mandate's public health goals. The risks associated with the two are not comparable. Reducing the risk of adverse medical consequences for a high-risk segment of the population is essential to achieving the public health objective of the vaccine mandate. A religious exemption would not address a risk associated with the vaccine mandate's central objectives. Under *Tandon*'s reasoning, rational basis review applies.

*Tandon* is distinguishable from this case in another respect. The vaccination requirement challenged here does not prevent the Plaintiffs from exercising their religious beliefs by refusing to receive the COVID-19 vaccination. In contrast, in *Tandon* interference with the free exercise of religion was direct because the statute

19

prevented like-minded persons from gathering together to perform religious rituals. Here, the Rule does not compel the Plaintiffs to be vaccinated against their will, and the Plaintiffs have, in fact, freely exercised their religious beliefs by declining to be vaccinated. This is not to minimize the seriousness of the indirect consequences of the Plaintiffs' refusal to be vaccinated, as it affects their employment. Nonetheless, the Rule has not prevented the Plaintiffs from staying true to their professed religious beliefs.

The two remaining decisions in the trio relied upon by the Plaintiffs are also readily distinguished. In *South Bay United Pentecostal Church v. Newsom*,[13] the Court partially granted an application for injunctive relief from California Governor Gavin Newsom's executive order limiting attendance at indoor religious gatherings to prevent further spread of COVID-19. 141 S. Ct. at 716, 718. Writing separately, Justice Gorsuch concluded that the restrictions on religious institutions imposed by California followed a pattern of that state "openly impos[ing] more stringent regulations on religious institutions than on many businesses" throughout the pandemic, and that this represented religious discrimination and required strict scrutiny. *Id.* at 717 (statement of Gorsuch, J.). The restrictions considered in *South Bay* are unlike the vaccine mandate at issue here. *Id.* In *South Bay*, California had explicitly imposed stricter attendance limits on in-person worship services, while not

---

[13] The California Order challenged in *South Bay* came before the Court twice on application for injunctive relief:  in May 2020, the Court issued a memorandum opinion denying the application, 140 S. Ct. 1613, 1613 (2020) (Mem.); in February 2021 the Court denied relief with respect to the percentage capacity limitations imposed on houses of worship and limitations on singing and chanting during indoor services, and granted the injunction with respect to the other capacity limits, 141 S. Ct. 716, 716 (2021) (Mem.).

imposing similar limits in secular settings.  There is no similar targeted imposition of restrictions on religious practices presented by the COVID-19 vaccine mandate.

Finally, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court granted injunctive relief from a State of New York order that imposed severe restrictions on religious gatherings in certain high-risk zones of New York City during the first wave of the Covid-19 pandemic.  141 S. Ct. at 66.  Specifically, the order limited attendance at religious gatherings in "red" zones to no more than ten persons and in "orange" zones to no more than 25 persons, while allowing myriad essential businesses in those same locations to admit an unlimited number of persons.  *Id*. at 66-67.  Invoking *Smith,* the Court determined that the challenged order was neither neutral nor generally applicable due to these categorizations.  *Id*. at 67.  Applying strict scrutiny, the Court held that although "[s]temming the spread of COVID-19 is unquestionably a compelling interest," the regulation was likely unconstitutional for lack of narrow tailoring.  *Id*.  There were multiple less restrictive rules that could have achieved the State's goal without burdening the exercise of religion so severely, such as tying the maximum attendance at a house of worship to the size of that facility.  *Id*.  The Court was not persuaded that the State demonstrated that houses of worship, which had "admirable safety records," "contributed to the spread of COVID-19" such that the targeted and restrictive prohibition could be constitutionally sound.  *Id*. at 67-68.

*Roman Catholic Diocese of Brooklyn* is distinguishable from the COVID-19 vaccine mandate at issue here because the mandate does not impose restrictions on religious practices while allowing similar secular conduct to continue unfettered.

Additionally, the vaccine mandate does not compel the Plaintiffs to be vaccinated for COVID-19 involuntarily and, therefore, the Plaintiffs have not been directly prevented from adhering to their religious beliefs as was the case in *Roman Catholic Diocese of Brooklyn*. Finally, as I will soon address, the State Defendants have demonstrated that other less-restrictive measures would be insufficient alternatives to the vaccine mandate.

Therefore, the COVID-19 vaccine mandate is facially neutral, and the trio of recent Supreme Court per curiam and memorandum COVID-19 decisions does not dictate otherwise. Additionally, in probing for covert animus, what matters is the State's motive in removing the vaccine exceptions for religion and philosophy from the statute in 2019 because it was then—not in 2021 as Plaintiffs assert—that the change took effect. The Plaintiffs have not offered any reasoned explanation as to why Maine's COVID-19 vaccine mandate for healthcare workers should be viewed as targeting religious beliefs while vaccines for other communicable diseases that may have involved fetal cell lines in their development or production should not. The record establishes that the Maine Legislature's object in eliminating the religious and philosophical exemptions in 2019 was to further crucial public health goals, and nothing more.

Specifically, the Legislature considered data establishing that it was the religious and philosophical exemptions to mandatory vaccines that had prevented Maine from achieving herd immunity as to several infectious diseases, which is a

prerequisite to eliminating those diseases.[14]  Measles, for example, requires a 95%

population-level vaccination rate, ECF No. 49-4 ¶ 35, and this was undermined in the

years prior to 2019 by the large percentage of unvaccinated persons resulting from

the religious and philosophical exemptions, ECF No. 48-3 at 3-6.  As Representative

McDonald, cosponsor of the legislation, testified:

> Maine has the seventh-highest non-medical exemption rate in the
> nation. . . .  The average philosophical and religious exemption rate for
> kindergarten-aged students in Hancock County, ME was 8.7
> percent. . . .  There are schools [in Hancock County] experiencing non-
> medical exemption rates as high as 33.3 percent.

ECF No. 48-3 at 1.

Then-Acting Director of Maine CDC, Nancy Beardsley, testified that "non-

medical exemptions, which include religious and philosophical reasons, were reported

at 5.0% for Maine, compared to the national rate of 2.0%." ECF No. 48-4 at 1.  Medical

exemptions, in contrast, accounted for 0.3% of the overall exemption rate.  ECF No.

48-4 at 1.  Beardsley also testified that the high exemption rates in Maine had caused

pertussis outbreaks:

> Hancock and Waldo counties also represent two of the four counties with
> the highest reported rates of pertussis cases in 2018 . . . .  Not only did
> high exemption rates likely contribute to high rates of pertussis disease
> in these two counties, but also in the entire State, as Maine reported the
> highest rate of pertussis disease in the country for 2018.

ECF No. 48-4 at 2.

---

[14] The statistics referenced in the legislative record, and cited here, pertain to vaccination rates for
school children; however, they are relevant to the State's motivations for healthcare workers because
the statute at issue removed religious and philosophical exemptions for both of these groups and there
is no colorable argument (nor have the Plaintiffs advanced one) that the State had a different
motivation for removing the exemptions for healthcare workers than for school children.

The Plaintiffs have not specifically disputed that the reasons put forward by the State Defendants for the Legislature's removal of the religious and philosophical exemptions in 2019 were, in fact, the actual reasons. Accordingly, there is no factual support for the proposition that the August 2021 amendment of the Rule, adding the COVID-19 vaccine to the list of mandatory vaccinations for Maine's healthcare workers, "specifically target[ed] Plaintiffs' religious beliefs for disparate and discriminatory treatment," as the Plaintiffs argue. ECF No. 1 ¶ 131. Moreover, there is no basis to find that the August 2021 amendment of the Rule, including the removal of the religious and philosophical exemptions so that the Rule would conform to the 2019 amendment to the statute, was intended to discriminate against religious beliefs, practices, or motivations. *See Lukumi*, 508 U.S. at 534. For these reasons, the COVID-19 vaccine mandate is neutral because it is facially neutral and it was not intended to discriminate against individuals' religious beliefs, practices, or motivations.

### 2.   **General Applicability**

General applicability addresses whether the State has selectively "impos[ed] burdens only on conduct motivated by religious belief." *Id.* at 543. The Plaintiffs reason that the COVID-19 vaccine mandate is not generally applicable and that it must be subjected to strict scrutiny review because the mandate favors healthcare workers who refuse to be vaccinated for medical reasons over healthcare workers who refuse to be vaccinated for religious reasons. They contend that the State's adoption of medical exemptions as the sole type of exemption reflects a value judgment by the State, one which prioritizes secular interests over religious interests. Thus, they

contend that the vaccine mandate fails the test of general applicability because it burdens religious beliefs while not similarly burdening secular interests.

Individualized exemptions undermine a regulation's general applicability if they display an unconstitutional value judgment that gives preference to secular concerns over religious concerns. In *Fulton*, the Supreme Court explained that "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877; *see also Cent. Rabbinical Cong. Of U.S. & Can. V. N.Y.C. Dep't. of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) (citing *Lukumi*, 508 U.S. at 535-38). ("A law is . . . not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it.") "[W]hen the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny." *Fraternal Ord. of Police, Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999).

The Plaintiffs contend that the medical exemption at issue here should be treated as an individualized exception which is "sufficiently suggestive of discriminatory intent so as to trigger heightened [strict] scrutiny." *Id*. They point to various judicial decisions applying strict scrutiny and invalidating regulations that permitted medical exemptions but not religious exemptions. However, the decisions cited by the Plaintiffs all relate to government regulations that were primarily intended to achieve governmental objectives other than protecting public health.

Thus, in *Fraternal Order of Police*, *id*, the court applied strict scrutiny and invalidated a regulation that prohibited beards for male police officers that was adopted for the stated purpose of promoting uniformity of the officers' appearance, and which granted a medical exemption from the requirement while not exempting officers who maintained beards as a matter of religious faith.  The other decisions cited by the Plaintiffs addressed similar circumstances.  *See Litzman v. New York City Police Department*, No. 12 Civ. 4681, 2013 WL 6049066, at *2-3 (S.D.N.Y. Nov. 15, 2013) (requiring religious exemptions to a policy mandating once-yearly facial shaving for male police officers to ensure compliance with respirator fit-testing requirements); *Singh v. McHugh*, 185 F. Supp. 3d 201, 211-13 (D.D.C. 2015) (determining that religious accommodation was required under a policy that would not permit a Sikh student seeking to enroll in the Army's Reserve Officers' Training Corps program to wear a turban, unshorn hair, and beard due to a grooming policy to promote uniformity); and *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 599 (W.D. La. 2019) (determining a policy requiring beards for male officers "for officer safety reasons and to promote a uniform appearance of all officers" required religious accommodations).

Here, the purpose of requiring COVID-19 vaccinations for healthcare workers is to protect public health and not any other policy objective, such as promoting the uniformity of the appearance of police officers or firefighters.  Exempting individuals whose health will be threatened if they receive a COVID-19 vaccine is an essential, constituent part of a reasoned public health response to the COVID-19 pandemic.  It does not suggest a discriminatory bias against religion.  *See W.D. v. Rockland County,*

521 F. Supp. 3d 358, 403 (S.D.N.Y. 2021) (concluding that New York's emergency declaration mandating vaccinations against measles, which provided a medical exemption but not a religious exemption, met the requirement of general applicability by "encouraging vaccination of all those for whom it was medically possible, while protecting those who could not be inoculated for medical reasons.").

The medical exemption at issue here was adopted to protect persons whose health may be jeopardized by receiving a COVID-19 vaccination. The exemption is rightly viewed as an essential facet of the vaccine's core purpose of protecting the health of patients and healthcare workers, including those who, for bona fide medical reasons, cannot be safely vaccinated. Because the medical exemption serves the core purpose of the COVID-19 vaccine mandate, it does not reflect a value judgment prioritizing a purely secular interest—such as the uniformity of appearance of uniformed officers considered in *Fraternal Order of Police*—over religious interests. In addition, the vaccine mandate places an equal burden on all secular beliefs unrelated to protecting public health—for example, philosophical or politically-based objections to state-mandated vaccination requirements—to the same extent that it burdens religious beliefs.

The medical exemption applicable to the COVID-19 vaccine and the other vaccines required under Maine law does not reflect a value judgment unfairly favoring secular interests over religious interests. As an integral part of the vaccine requirement itself, the medical exemption for healthcare workers does not undermine the vaccine mandate's general applicability.

### 3.    Conclusion Regarding the Standard of Constitutional Review

For the reasons I have explained, the COVID-19 vaccine mandate is both neutral and generally applicable; therefore, rational basis review applies.  The trio of recent Supreme Court *per curiam* and memorandum decisions relied on by the Plaintiffs do not suggest otherwise.  I therefore turn to consider whether the mandate satisfies rational basis review.

### 4.    Rational Basis Review

The Plaintiffs do not seriously question the existence of a rational basis for the adoption of the COVID-19 vaccine mandate.  I address this question nonetheless because it is the key to deciding the requirement's constitutionality under the Free Exercise Clause.  "A law survives rational basis review so long as the law is rationally related to a legitimate governmental interest."  *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008).

Stopping the spread of COVID-19 in Maine, and specifically stemming outbreaks in designated healthcare facilities to protect patients and healthcare workers, is a legitimate government interest.  For several reasons, the mandate is rationally related to this interest.

First, data collected by Maine CDC throughout the COVID-19 pandemic demonstrates that unvaccinated individuals are substantially more likely both to contract COVID-19 and to suffer serious medical consequences as a result.  ECF No. 49-4 ¶¶ 16, 23, 52.  Second, the percentage of COVID-19 outbreaks occurring in healthcare facilities is increasing rapidly and most of these outbreaks are caused by healthcare workers bringing the virus into the facilities.  ECF No. 49-4 ¶¶ 46-48.

Third, despite widespread availability of COVID-19 vaccinations, the rate of COVID-19 vaccinations for healthcare workers in designated healthcare facilities remains below the 90% threshold needed to stem facility-based outbreaks. ECF No. 49-4 ¶¶ 53-54. Mandating COVID-19 vaccinations for healthcare workers at designated healthcare facilities will increase the vaccination rate for a critically important segment of Maine's workforce while lowering the risk of facility-based outbreaks.

The State defendants have provided ample support demonstrating a rational basis for their adoption of the COVID-19 vaccine mandate as a requirement that furthers the government's interest in protecting public health, healthcare workers, vulnerable patients, and Maine's healthcare system from the spread of COVID-19.

### 5.   Strict Scrutiny Review

Although I conclude that rational basis, and not strict scrutiny, is the correct level of constitutional review, even if strict scrutiny were the required standard, the COVID-19 vaccine mandate for healthcare workers still withstands the Plaintiffs' Free Exercise challenge. As previously discussed, a challenged government action subject to strict scrutiny may be upheld only if "it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533. The government must also demonstrate that it "seriously undertook to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

### a. Compelling Interest

Curbing the spread of COVID-19 is "unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67.  Plaintiffs here admit as much, conceding that "[t]o be sure, efforts to contain the spread of a deadly disease are 'compelling interests of the highest order.'"  ECF No. 57 at 8 (quoting *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 910 (W.D. Ky. 2020)).

### b. Narrow Tailoring

The record establishes that "[t]he gold standard to prevent and stop the spread of communicable diseases, including COVID-19, is vaccination."  ECF No. 49-4 at ¶ 34.  High vaccination rates minimize the number of unvaccinated individuals in group settings—such as healthcare environments—which ultimately facilitates population-level immunity and prevents outbreaks of these diseases both within these settings and in the general population.  ECF No. 49-4 at ¶¶ 35-37.  Achieving the high levels of vaccination needed to establish population-level immunity is crucial to protect the health of the most vulnerable individuals, including "individuals with weakened immune systems, infants too young to be vaccinated, and persons unable to be vaccinated."  ECF No. 49-4 at ¶¶ 38-39.  For "individuals undergoing treatment for serious diseases, and individuals who have a demonstrated allergy to one of the vaccine components," certain vaccinations are inadvisable for medical reasons.  ECF No. 49-4 at ¶ 39.  For these people, receiving a particular vaccine could have adverse health consequences.  ECF No. 49-4 at ¶ 39.

The Plaintiffs' sole challenge to the scientific rationale put forward by the State Defendants for the vaccine mandate is based on the Plaintiffs' citation to an article

published in National Geographic Magazine that reports on a preliminary study that found that vaccinated persons with breakthrough COVID-19 infections can transmit the virus. This preliminary finding, however, does not address the broader question of whether COVID-19 vaccinations reduce the risk of people spreading the virus that causes COVID-19. According to the CDC, they do. CDC, *Key Things to Know About COVID-19 Vaccines*, (Oct. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html ("COVID-19 vaccines can reduce the risk of people spreading the virus that causes COVID-19."). Nor does the National Geographic article address the related question of whether vaccinated persons become infected at a lesser rate than unvaccinated persons and whether vaccinations provide substantial protection against COVID-19 hospitalizations. On these points as well, the CDC indicates that they do. *Id.* ("People can sometimes get COVID-19 after being fully vaccinated. However, this only happens in a small proportion of people, even with the Delta variant. When these infections occur among vaccinated people, they tend to be mild."); *see also* Ashley Fowlkes et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance—Eight U.S. Locations, December 2020–August 2021*, CDC (Aug. 27, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm?s_cid=mm7034e4_w; Wesley H. Self, et al., *Comparative Effectiveness of Moderna, Pfizer-BioNTech, and Janssen (Johnson & Johnson) Vaccines in Preventing COVID-19 Hospitalizations Among Adults Without Immunocompromising Conditions—United States, March–August 2021*, CDC (Sept. 24, 2021),

https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e1.htm?s_cid=mm7038e1_w.

The study cited by the Plaintiffs does not establish a lack of narrow tailoring for purposes of strict scrutiny analysis.  If vaccinated individuals are less likely to become infected, they are less likely to transmit the disease.  The preliminary study cited by the Plaintiffs does not call this crucial point into question.

Plaintiffs further contend that the COVID-19 vaccine mandate is not the least restrictive means of achieving the State's goal to protect public health and the healthcare system from communicable disease.  They argue that there are alternatives to vaccination that would not restrict their religious beliefs, and that Maine has not demonstrated that these alternatives would not achieve the objectives of the Rule.  Plaintiffs specifically point to the use of PPE and frequent testing as less restrictive tactics that Maine could employ.

The record demonstrates that PPE and regular testing are not sufficient to achieve Maine's compelling interest in stopping the spread of COVID-19.  Regular testing, an alternative method proposed by the Plaintiffs, was considered and ultimately rejected because "regular testing for the presence of the virus in employees is insufficient to protect against the Delta variant."  ECF No. 49-4 at ¶ 61. The speed of the Delta variant's transmission outpaces test-result availability.  ECF No. 49-4 at ¶¶ 61-62.  With weekly or twice-weekly testing, "[a]n employee who tests negative on a Monday morning could be exposed that afternoon, and, within 36 hours, could be spreading the virus to others over the course of the several days until the next test."  ECF No. 49-4 at ¶ 61.  Further, "[b]ecause test results are not available for at least 24 hours, and sometimes up to 72 hours, daily PCR testing is insufficient for the same

reasons." ECF No. 49-4 at ¶ 61.  Daily testing, therefore, would require the use of rapid antigen tests, which are both less accurate and in short supply.  ECF No. 49-4 at ¶ 62.  Accordingly, regular testing is not an alternative measure that would effectively serve to stop the spread of COVID-19.

The use of PPE is also not an equivalent alternative measure.  PPE is an important measure to prevent the spread of transmissible diseases, including COVID-19, but "it does not eliminate the possibility of spreading COVID-19, especially in healthcare settings." ECF No. 49-4 at ¶ 64.  Maine healthcare facilities have utilized PPE and other practices, including regular testing and symptom monitoring, to reduce healthcare facility-based COVID-19 outbreaks.  ECF No. 49-4 at ¶ 65.  These measures have not been sufficient to prevent these outbreaks.  In the face of the Delta variant and rising percentage of healthcare facility-based outbreaks, they are not alternative equivalent measures that would achieve the compelling interest of curbing the spread of COVID-19.

Next, Plaintiffs argue that Maine currently stands alone in the nation by not providing religious exemptions to vaccine mandates for healthcare workers, [15] which necessarily demonstrates that less restrictive alternatives are available.  The Plaintiffs reason that if every other state has been able to offer religious exemptions

---

[15]  At least two other states have adopted COVID-19 vaccine mandates which do not provide religious exemptions.  In August 2021, the State of New York mandated COVID-19 vaccinations for healthcare workers in the state and did not include a religious exemption within the mandate.  *Dr. A. v. Hochul*, No. 1:21-cv-1009, 2021 WL 4189533 (N.D.N.Y. Sept. 14, 2021).  A preliminary injunction against the requirement was granted on October 12, 2021, *Dr. A. v. Hochul*, No. 1:21-cv-1009 (N.D.N.Y. Oct. 12, 2021); as previously discussed, this case is distinguishable from Maine's vaccine mandate.  Rhode Island has also mandated COVID-19 vaccinations for healthcare workers and did not provide for religious exemptions to that requirement; a temporary injunction was denied on September 30, 2021.  *Dr. T v. McKee*, No. 1:21-cv-00387 (D.R.I. Sept. 30, 2021).

to COVID-19 mandates, Maine should as well.  However, the Plaintiffs have not provided any scientific or expert evidence demonstrating the efficacy of the approaches adopted in other states.  Maine may be one of the first states to conclude that it is wise to mandate vaccinations for certain healthcare workers, but it does not follow that other, less demanding approaches are equally effective or even appropriate given the circumstances presented in this state.  The Government Defendants assert that unlike many other states, "the size of Maine's healthcare workforce is limited, such that the impact of any outbreaks among personnel is far greater than it would be in a state with more extensive healthcare delivery systems." ECF No. 49-4 at ¶ 66.  The Plaintiffs have not presented any expert witness declarations, science-based reports or data, or any other information to support their argument that there are equally effective, less restrictive alternatives to the vaccine mandate.  Based on the record before me, there is no basis to conclude that, as the Plaintiffs' position suggests, what may be good enough for other states is necessarily equally good for the conditions presented in Maine.

Accordingly, I conclude that the COVID-19 vaccine mandate is narrowly tailored to serve the compelling interest of containing the spread of this serious communicable disease.  Even if strict scrutiny were required, the Plaintiffs have not shown that they are likely to succeed on the merits of their Free Exercise claim against the Defendants.

## B.     Title VII

Seven plaintiffs[16] assert that the Hospital Defendants refused to consider or grant religious accommodations by failing to grant exemptions from the vaccine mandate and that this refusal violates Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e to e-17 (West 2021).

Title VII forbids an employer "to discriminate against, any individual because of his . . . religion." 42 U.S.C.A. § 2000e-2(c)(1).  Discrimination is effected through an adverse employment action: "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Title VII requires that employers "offer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).

The Plaintiffs argue that the Hospital Defendants have unlawfully discriminated against them by refusing to grant exemptions to the COVID-19 vaccine mandate and terminating, or threatening to terminate, their employment for abiding by their sincerely held religious beliefs.  At the time of filing, Plaintiffs had not exhausted the administrative remedies available to them for their claim of unlawful employment discrimination, such as pursuing a complaint with the Maine Human Rights Commission or Equal Employment Opportunity Commission.

---

[16]  Jane Does 1 through 5 and John Does 2 and 3.

The Supreme Court has "set a high standard for obtaining preliminary injunctions restraining termination of employment." *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)). The case must present a "genuinely extraordinary situation" to support granting an injunction, *Sampson*, 415 U.S. at 92 n.68; allegations of "humiliation, damage to reputation, and loss of income" are insufficient to meet that standard, *Bedrossian*, 409 F.3d at 845, as are "deterioration in skills" and "inability to find another job," *id.* at 846. Courts generally do not grant preliminary injunctions to prevent termination of employment, because "the termination . . . of employment typically [is] not found to result in irreparable injury." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2021). Injuries incurred in employment discrimination claims may be addressed through remedies at law, such as reinstatement, back pay, and damages. 42 U.S.C.A. § 2000e-5(g). In addition, in the ordinary course, Title VII violations must be addressed first through the administrative processes available under federal law. *See* 42 U.S.C.A. § 2000e-5(f)(1)), *see also Rodriguez v. United States*, 852 F.3d 67, 78 (1st Cir. 2017) ("It is settled that a federal court will not entertain employment discrimination claims brought under Title VII unless administrative remedies have first been exhausted.").

The Plaintiffs have not shown that the injuries they have suffered or may suffer—the loss of their employment and economic harm—meet the high standard for preliminary injunctive relief required to restrain an employer from terminating an employee's employment. Administrative remedies are available to the Plaintiffs that have not been exhausted. For these reasons, Plaintiffs have not demonstrated a

likelihood of success on their Title VII claims to the degree needed to support preliminary injunctive relief.

## C.   **Equal Protection Clause**

The Plaintiffs argue that the COVID-19 vaccine mandate impermissibly creates a class of religious objectors and then subjects them to disparate treatment, in violation of the Equal Protection Clause.   "[W]here a law subject to an equal protection challenge 'does not violate [a plaintiff's] right of free exercise of religion,' courts do not 'apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test.'"   *W.D.*, 521 F. Supp. 3d at 410 (second alteration in original) (quoting *A.M. ex rel. Messineo v. French*, 431 F. Supp. 3d 432, 446 (D. Vt. 2019)); *accord Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005) ("Because we [hold] that the [challenged law] does not violate the Free Exercise Clause, we apply rational basis scrutiny to the fundamental rights based claim that [the law] violates equal protection.").

As described above, because the Plaintiffs have not demonstrated a likelihood of success on their Free Exercise Clause claim and I have found, at this stage, that the vaccine mandate is rationally based, the Plaintiffs have not demonstrated a likelihood of success that their Equal Protection claim is warranted, and no additional analysis is required.

## D.   **Conspiracy**

The Plaintiffs claim that the State and Hospital Defendants conspired to violate their civil rights in violation of 42 U.S.C.A. § 1985, but provide only conclusory, nonfactual allegations in support.  Because a violation of Plaintiffs' First Amendment

rights has not been demonstrated, and the Plaintiffs have not submitted any declarations or other documentary evidence showing a conspiracy among the Defendants, no additional analysis regarding the claimed conspiracy is warranted.

**E.     Supremacy Clause**

Finally, the Plaintiffs contend that the Defendants violated the Supremacy Clause of the U.S. Constitution by ignoring federal law and proceeding as if Maine law supersedes federal law.

The Supremacy Clause "is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). Rather, the Supremacy Clause "creates a rule of decision" that "instructs courts what to do when state and federal law clash." *Id*. Additionally, the Plaintiffs' assertion that "Defendants have explicitly claimed to healthcare workers in Maine, including Plaintiffs, that federal law does not apply" in Maine is wholly unsupported by the record. ECF No. 1 at ¶ 1.

The Plaintiffs have not demonstrated a likelihood of success on their Supremacy Clause claim.

**F.     Irreparable Harm, Balancing of the Equities, and Effect of the Court's Action on the Public Interest**

Where plaintiffs fail to meet their burden to show a likelihood of success on the merits, "failure to do so is itself preclusive of the requested relief." *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021). In the interest of completeness, though, I address the three remaining prongs of the preliminary injunction inquiry.

First, the harm faced by Plaintiffs Jane Does 1 through 6 and John Does 2 through 3 is the loss of their employment, which, while serious and substantial, is not irreparable. These plaintiffs may pursue remedies at law for alleged discriminatory firings, including reinstatement, back pay, and damages. Although John Doe 1, as a healthcare provider, faces the possibility of more consequential harm through the potential loss of a business license, that harm does not outweigh the other factors I must consider.

Second, the balance of equities favors the Defendants because of the strong public interest promoted by the vaccine mandate, which includes preventing facility-based COVID-19 outbreaks that risk the health of vulnerable patients, healthcare workers, and the infrastructure of Maine's healthcare system itself. If Plaintiffs were granted injunctive relief preventing the Rule from being enforced, these objectives would be thwarted. *See Bayley's Campground Inc. v. Mills,* 463 F. Supp. 22, 38 (D. Me. 2020) (denying injunctive relief against Maine's COVID-19 quarantine requirement for out-of-state visitors because "[t]he type of injunctive relief Plaintiffs seek would upset the bedrock of the state's public health response to COVID-19, an area this Court does not wade into lightly"), *aff'd,* 985 F.3d 153 (1st Cir. 2021).

Finally, the vaccine mandate is directly aimed at promoting the public interest. This factor weighs heavily against granting preliminary injunctive relief in this case. Many courts that have examined requests for preliminary injunctions against COVID-19 restrictions have come to this same conclusion, as it is clear that "[w]eakening the State's response to a public-health crisis by enjoining it from enforcing measures employed specifically to stop the spread of COVID-19 is not in

the public interest." *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 789 (W.D.N.Y. Oct. 21, 2020); *see also Harris*, 2021 WL 3848012, at *8 ("[G]iven the public health efforts promoted by the [COVID-19] Vaccine Policy, enjoining the continuation of same is not in the public interest."); *Klaassen*, 2021 WL 3073926, at *43 (noting that when individuals refuse vaccination, "the evidence reasonably shows that they aren't the only ones harmed by refusing to get vaccinated: refusing while also not complying with heightened safety precautions could 'sicken and even kill many others who did not consent to that trade-off,'" which "certainly impacts the public interest" (quoting *Cassell v. Snyders*, 990 F.3d 539, 550 (7th Cir. 2021)).   So too, here. Enjoining the Rule is not in the public interest.

Thus, in addition to failing to show a likelihood of success on the merits, I find that the Plaintiffs have not demonstrated an entitlement to relief under any of the three other factors in the preliminary injunction inquiry.

## V. CONCLUSION

Both the serious risk of illness and death associated with the spread of the COVID-19 virus and the efforts by state and local governments to reduce that risk have burdened most aspects of modern life.   In this case, the Plaintiffs—healthcare workers and a healthcare provider—have shown that their refusal to be vaccinated based on their religious beliefs has resulted or will result in real hardships as it relates to their jobs.   They have not, however, been prevented from staying true to their professed religious beliefs which, they claim, compel them to refuse to be vaccinated against COVID-19.   Neither have they seriously challenged the compelling governmental interest in mandating vaccinations for Maine's healthcare workers, nor

have they demonstrated that, as they contend, the vaccine mandate was motivated by any improper animus toward religion.

Because the Plaintiffs have not established grounds that would warrant the entry of a preliminary injunction enjoining the enforcement of Maine's Covid-19 vaccine mandate for healthcare workers, the Motion for Preliminary Injunction (ECF No. 3) is **DENIED**.

**SO ORDERED.**

**Dated this 13th day of October, 2021.**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**