# United States Court of Appeals
## For the First Circuit

No. 21-1826

JANE DOES 1-6; JOHN DOES 1-3; JACK DOES 1-1000; JOAN DOES 1-1000,

Plaintiffs, Appellants,

v.

JANET T. MILLS, in her official capacity as Governor of the
State of Maine; JEANNE M. LAMBREW, in her official capacity as
Commissioner of the Maine Department of Health and Human
Services; NIRAV D. SHAH, in his official capacity as Director of
the Maine Center for Disease Control and Prevention;
MAINEHEALTH; GENESIS HEALTHCARE OF MAINE, LLC; GENESIS
HEALTHCARE, LLC; NORTHERN LIGHT HEALTH FOUNDATION; MAINEGENERAL
HEALTH,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Barron, Circuit Judges.

Mathew D. Staver, Horatio G. Mihet, Roger K. Gannam, Daniel
J. Schmid, and Liberty Counsel on brief for appellants.
Kimberly L. Patwardahan, Assistant Attorney General, Valerie
A. Wright, Assistant Attorney General, Thomas A. Knowlton, Deputy
Attorney General, Aaron M. Frey, Attorney General, on brief for
appellees Janet T. Mills, Jeanne M. Lambrew, and Nirav D. Shah.
James R. Erwin, Katherine I. Rand, and Pierce Atwood LLP on
brief for appellees MaineHealth, Genesis Healthcare of Maine, LLC,

Genesis Healthcare, LLC, and MaineGeneral Health.

     <u>Ryan P. Dumais</u>, <u>Katherine L. Porter</u>, and <u>Eaton Peabody</u> on brief for appellee Northern Light Health Foundation.

———————————

October 19, 2021

———————————

**LYNCH**, **Circuit Judge**.  Faced with COVID-19's virulent delta variant and vaccination rates among healthcare workers too low to prevent community transmission, Maine's Center for Disease Control ("Maine CDC") promulgated a regulation effective August 12, 2021, requiring all workers in licensed healthcare facilities to be vaccinated against the virus.  Under state law, a healthcare worker may claim an exemption from the requirement only if a medical practitioner certifies that vaccination "may be medically inadvisable."  Me. Rev. Stat. tit. 22, § 802(4-B) (West 2021).  Maine has mandated that its healthcare workers be vaccinated against certain contagious diseases since 1989.  It has not allowed religious or philosophical exemptions to any of its vaccination requirements since an amendment to state law in May 2019 (which took effect in April 2020), and the COVID-19 mandate complies with that state law.

Several Maine healthcare workers (and a healthcare provider who runs his own practice) sued, arguing that the vaccination requirement violates their rights including those under the Free Exercise Clause of the U.S. Constitution.  They sued the Governor, the commissioner of the Maine Department of Health and Human Services ("Maine HHS"), and the director of Maine CDC alleging violations of the Free Exercise Clause, Supremacy Clause, Equal Protection Clause, and 42 U.S.C. § 1985.  They also sued several Maine hospitals, which employ seven of the nine

appellants, alleging violations of the Supremacy Clause, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1985.

The appellants sought a preliminary injunction to prevent enforcement of the regulation against them. The district court denied their motion. Doe v. Mills, No. 1:21-cv-242-JDL, 2021 WL 4783626 (D. Me. Oct. 13, 2021).

We affirm.

**I.**

Maine has long required that healthcare workers be vaccinated against infectious diseases. See 1989 Me. Laws ch. 487, § 11. Prior to 2019, state law exempted workers from vaccination in three circumstances: when vaccination was medically inadvisable, contrary to a sincere religious belief, or contrary to a sincere philosophical belief. Id. In 2019, the state responded to declining vaccination rates by amending its law to allow for only the medical exemption.[1] 2019 Me. Laws ch. 154, § 9 (codified at Me. Rev. Stat. Ann. tit. 22, § 802 (2021)); see Hearing on LD 798, An Act to Protect Maine Children and Students from Preventable Diseases by Repealing Certain Exemptions from the Laws Governing Immunization Requirements Before the J. Standing Comm. on Educ. & Cultural Affs., 129th Legis., 1st Reg. Sess. (Me.

---

[1] It made the same change to the laws requiring public-school students and nursery-school employees to be vaccinated. See 2019 Me. Laws ch. 154, §§ 3-4, 6, 10.

- 4 -

2019) (statements of Rep. Tipping, Rep. McDonald, and Maine CDC Acting Dir. Beardsley); House Rec. H-392, 393-94 (Me. Apr. 23, 2019) (statement of Rep. Tipping).  The bill's sponsor explained that one key rationale for the change was to protect the immunocompromised "who will never achieve the immunities needed to protect them and [who] rely on their neighbors' vaccinations." Hearing on LD 798, supra (statement of Rep. Tipping).  The law went into effect in 2020, after nearly three-quarters of voters rejected a referendum seeking to veto the law.  In April 2021, Maine CDC updated its mandatory vaccination regulations to reflect the statutory changes.  364 Me. Gov't Reg. 26 (LexisNexis May 2021); Code Me. R. tit. 10-144, ch. 264, § 3 (West 2021).  In adopting that new rule, Maine explained that it was acting to reduce the "risk for exposure to, and possible transmission of, vaccine-preventable diseases resulting from contact with patients, or infectious material from patients."  At the time, the rule required vaccination (without religious or philosophical exemption) against measles, mumps, rubella, chickenpox, hepatitis B, and influenza.  Code Me. R. tit. 10-144, ch. 264, § 2.  Contrary to the appellants' claims, Maine changed its vaccination laws to eliminate the religious and philosophical exemptions well before the COVID-19 pandemic was rampant.

Maine has articulated a strong interest in protecting the health of its population and has taken numerous steps, both

before and after the development of the COVID-19 vaccines, to do
so.[2]  Maine's population is particularly vulnerable to COVID-19
because it has the largest share of residents aged 65 and older in
the country.  U.S. Census Bureau, 65 and Older Population Grows
Rapidly as Baby Boomers Age, Release No. CB20-99 (June 25, 2020),
https://www.census.gov/newsroom/press-releases/2020/65-older-
population-grows.html.  After COVID-19 vaccines became available,
Maine encouraged all its residents to be vaccinated and took
particular steps along those lines addressed to health care
workers.  Maine took the following steps:

- Starting in December 2020, Maine HHS and Maine CDC
  held regular information sessions with clinicians
  to educate them about the vaccines including plans
  for vaccine distribution and methods for addressing
  vaccine hesitancy.

- Starting that same month, Maine HHS and Maine CDC
  convened a working group to study the most
  effective ways of educating clinicians on the
  vaccines.

---

[2]     Before vaccines became available, state officials had
taken many steps to curb the spread of COVID-19.  See Calvary
Chapel of Bangor v. Mills, No. 1:20-CV-156-NT, 2021 WL 2292795, at
*1-7 (D. Me. June 4, 2021) (describing efforts), appeal filed, No.
21-1453 (1st Cir. docketed June 14, 2021).

- Given the limited vaccine availability in December 2020 and January 2021, Maine gave priority to frontline healthcare workers over other groups in the population during the first stage of vaccine distribution. Hospitals offered on-site vaccination to their staff and other eligible recipients.

- Because COVID-19 poses greater risks of infection and death to older people, Maine CDC prioritized older residents as well. It started with residents older than seventy and then expanded first to residents older than sixty and then to residents older than fifty.

- In partnership with Maine HHS and Maine CDC, hospitals provided several large public vaccination sites across the state. Maine HHS and Maine CDC helped staff the sites with public health, healthcare, and emergency-response volunteers.

- Maine CDC also distributed vaccines to healthcare facilities, EMS organizations, and pharmacies across the state.

- From March 2021, Maine HHS provided free transportation to vaccination sites to residents who could not get to the sites.

- From April to June, Maine HHS and Maine CDC offered a mobile vaccination unit in rural and underserved areas of the state.

- For twenty days in May, Maine HHS offered incentives to any Mainer who got his or her first dose of a COVID-19 vaccine.  Those eligible could choose between a complimentary fishing license, a complimentary hunting license, a Maine Wildlife Park Pass, a $20 L.L. Bean gift card, a ticket to a Portland Sea Dogs game, or an Oxford Plains Speedway Pass.

- In June, Governor Mills announced a prize sweepstakes, allowing all vaccinated residents to enter and tying the prize to the number of residents vaccinated by Independence Day weekend.  On July 4, a dialysis dietitian from Winslow won nearly $900,000.  Press Release, Office of Gov. Mills, Governor Mills Announces Winner of Don't Miss Your Shot: Vaccinationland Sweepstakes (July 4, 2021), https://www.maine.gov/governor/mills/news/governo

r-mills-announces-winner-dont-miss-your-shot-
vaccinationland-sweepstakes-2021-07-04.[3]

By the end of July 2021, 65.0% of Maine residents had received at
least one dose of a COVID-19 vaccine. However, the geographic
distribution of vaccination was, and remains, uneven throughout
the state. See Maine CDC, COVID-19 Vaccination Dashboard: COVID
Vaccination by County Listing, (last visited Oct. 15, 2021)
https://www.maine.gov/covid19/vaccines/dashboard; see also
Pietrangelo, 2021 WL 4487850, at *1 n.1 ("The accuracy of state
and federal vaccine distribution data cannot be reasonably
questioned . . . ."). Many counties report much lower vaccination
rates. Maine CDC, COVID-19 Vaccination Dashboard, supra. Efforts
to reach the elderly population have also shown geographic
differences. See id.

Despite these measures, Maine faced a severe crisis in
its healthcare facilities when the delta variant hit the state.[4]
According to Maine CDC, the delta variant is more than twice as

---

[3] "While our review is generally limited to the record
below, see Fed. R. App. P. 10, we may take judicial notice of facts
which are 'capable of being determined by an assuredly accurate
source.'" Pietrangelo v. Sununu, No. 21-1366, 2021 WL 4487850, at
*1 n.1 (1st Cir. Oct. 1, 2021) (citations omitted) (quoting United
States v. Hoyts Cinemas Corp., 380 F.3d 558, 570 (1st Cir. 2004)).

[4] The emergency rule defines a healthcare facility as "a
licensed nursing facility, residential care facility, Intermediate
Care Facility for Individuals with Intellectual Disabilities
(ICF/IID), multi-level healthcare facility, hospital, or home
health agency subject to licensure by [Maine HHS]."

contagious as previous variants and may cause more severe illness
than previous variants.  An individual infected with the delta
variant may transmit it to others within twenty-four to thirty-
six hours of exposure.  Those conditions threaten the entire
population of the state.  But health care facilities are uniquely
susceptible to outbreaks of infectious diseases like COVID-19
because medical diagnosis and treatment often require close
contact between providers and patients (who often are medically
vulnerable).  And outbreaks at healthcare facilities hamper the
state's ability to care for its residents suffering both from
COVID-19 and from other conditions.  That problem is particularly
acute in Maine because, as Maine CDC's director stated, "the size
of Maine's healthcare workforce is limited, such that the impact
of any outbreaks among personnel is far greater than it would be
in a state with more extensive healthcare delivery systems."  Maine
CDC determined that at least 90% of a population must be vaccinated
to prevent community transmission of the delta variant.  No county
in Maine, including those that have the highest vaccination rates,
has achieved the 90% level.  Maine CDC, COVID-19 Vaccination
Dashboard, supra.  Many counties are at much lower levels.  Id.
And while community has a broader meaning than workers at a
particular healthcare facility, even at those facilities the 90%
figure has not been reached.  At the end of the last monthly
reporting period before Maine CDC adopted the emergency rule,

- 10 -

ambulatory surgical centers achieved 85.9% of workers vaccinated;
hospitals hit only 80.3%, nursing homes reached 73.0%, and
intermediate care facilities for individuals with intellectual
disabilities only 68.2%.  On August 11, four of fourteen known
COVID-19 outbreaks in Maine were occurring at health care
facilities with "strong infection control programs."[5]  Those
outbreaks were mostly caused by healthcare workers bringing COVID-
19 into the facilities.

In adopting its emergency rule, Maine CDC considered the
adequacy of other measures to arrest the crisis in its healthcare
facilities and to protect both its healthcare infrastructure and
its residents.  Maine CDC considered the following alternatives to
mandatory vaccination:

- **Weekly or twice weekly testing.**  Maine CDC found
  that individuals infected with the delta variant
  can transmit the virus within twenty-four to
  thirty-six hours of exposure.  It thus concluded
  that periodic testing would be ineffective.

- **Daily testing.**  Maine CDC found that accurate
  polymerase chain reaction tests take twenty-four to
  seventy-two hours to provide results and that rapid
  antigen tests are too inaccurate and too hard to

---

[5]    By September 3, that number would jump to nineteen out
of thirty-three outbreaks.

reliably secure.  It thus concluded that daily testing would be ineffective.

- **Vaccination exemptions for individuals previously infected with COVID-19.**  Maine CDC found that the scientific evidence was uncertain as to whether a previously infected individual would develop sufficient immunity to prevent transmission.  It thus concluded that it could not justify such an exemption.

- **Continued reliance on personal protective equipment.**  Maine CDC found that the use of personal protective equipment reduced but did not eliminate the possibility of spreading COVID-19 in healthcare facilities.  It thus concluded that mandating personal protective equipment alone would be ineffective.

See Doe, 2021 WL 4783626, at *3.  For these stated reasons, Maine CDC concluded that none of its available alternatives to mandatory vaccination would allow it to protect its healthcare infrastructure and its residents.

On August 12, Maine HHS and Maine CDC issued an emergency rule adding COVID-19 to the list of diseases against which

healthcare workers must be vaccinated.[6]  Pointing to a 300%
increase in COVID-19 cases between June 19 and July 23 and the
danger of the delta variant, the agencies said the rule was
necessary because "[t]he presence of the highly contagious [d]elta
variant in Maine constitutes an imminent threat to public health,
safety, and welfare."  In announcing the rule, Governor Mills
explained that "[healthcare] workers perform a critical role in
protecting the health of Maine people, and it is imperative that
they take every precaution against this dangerous virus,
especially given the threat of the highly transmissible [d]elta
variant."  The rule requires healthcare facilities to "exclude[]
from the worksite" for the rest of the public health emergency
employees who have not been vaccinated.  In interpretive guidance,
Maine CDC clarified that the mandate does not extend to those
healthcare workers who do not work on-site at a designated
facility, for example those who work remotely.  Thus, employers
may accommodate some workers' requests for religious exemptions
provided that the accommodations do not allow unvaccinated workers
to enter healthcare facilities.  Maine HHS and Maine CDC later

---

[6]     Maine agencies may adopt temporary rules on an emergency
basis without going through regular notice and comment procedures
"to avoid an immediate threat to public health, safety or general
welfare."  Me. Rev. Stat. Ann. tit. 5, § 8054; see Ms. S. v. Reg'l
Sch. Unit 72, 829 F.3d 95, 105-06 (1st Cir. 2016) (describing Maine
rulemaking procedures).  Along with adopting the emergency rule,
Maine CDC has proposed a permanent rule, which is going through a
notice and comment period.

announced that they would not begin enforcing the rule until October 29.

Seeking to enjoin the emergency rule, the appellants filed suit in the District of Maine. The appellants are unvaccinated Maine healthcare workers (and a healthcare provider) who object to vaccination with any of the three available COVID-19 vaccines. They claim that their religious beliefs prohibit them from using any product "connected in any way with abortion." The appellants allege that Johnson & Johnson/Janssen used cells ultimately derived from an aborted fetus to produce its vaccine and that Moderna and Pfizer/BioNTech used the same type of cells in researching their vaccines. So, the appellants say, their religion prohibits them from being vaccinated. At least one appellant has lost her job with appellee Genesis Healthcare because she refused to get vaccinated. All the appellants allege causes of action under the Free Exercise Clause, the Equal Protection Clause, the Supremacy Clause, Title VII, and 42 U.S.C. § 1985.

The appellants sought an ex parte temporary restraining order and a preliminary injunction. The district court denied the motion for a temporary restraining order, concluding that the appellants failed to satisfy the requirements of Federal Rule of Civil Procedure 65(b)(1). It then received briefing and heard argument on the motion for a preliminary injunction. Following

the hearing, the district court denied the motion in a forty-one-page decision. <u>Doe</u>, 2021 WL 4783626, at *2.

The appellants sought and we denied an injunction pending appeal. We expedited proceedings and now resolve the appellants' appeal of the district court's order denying a preliminary injunction.

## II.

We review the district court's factual findings for clear error, its legal conclusions de novo, and its ultimate decision to deny the preliminary injunction for abuse of discretion.[7] <u>Norris ex rel. A.M.</u> v. <u>Cape Elizabeth Sch. Dist.</u>, 969 F.3d 12, 21 (1st Cir. 2020).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that

---

[7]     The appellants claim that our review of the facts in First Amendment cases must be de novo. The free speech cases they cite for that proposition, however, describe the deference due to a jury's verdict and turn on mixed questions of fact and law. <u>See</u> <u>Sindi</u> v. <u>El-Moslimany</u>, 896 F.3d 1, 14 (1st Cir. 2018) (citing <u>Bose Corp.</u> v. <u>Consumers Union of U.S., Inc.</u>, 466 U.S. 485 (1984)); <u>Veilleux</u> v. <u>Nat'l Broad. Co.</u>, 206 F.3d 92, 106 (1st Cir. 2000) (citing <u>Bose</u>). They do not stand for the proposition that our review of all factual findings is de novo. <u>See</u> <u>Bose</u>, 466 U.S. at 499-501 (explaining that in defamation cases, courts must engage in independent review of mixed questions of fact and law but that Rule 52(a) still applies to findings of fact). Nor is the distinction material as the appellants largely do not contest the district court's factual findings.

an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

## A.

## 1.

Applying the standard of review set forth above, we begin our analysis with the appellants' free exercise claims.

The First Amendment's Free Exercise Clause, as incorporated against the states by the Fourteenth Amendment, protects religious liberty against government interference. See Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940). When a religiously neutral and generally applicable law incidentally burdens free exercise rights, we will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest. See Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1876 (2021) (citing Emp. Div. v. Smith, 494 U.S. 872, 878-82 (1990)). When a law is not neutral or generally applicable, however, we may sustain it only if it is narrowly tailored to achieve a compelling governmental interest. Id. at 1881 (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)).

To be neutral, a law may not single out religion or religious practices. See Lukumi, 508 U.S. at 532-534. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their

religious nature." Fulton, 141 S. Ct. at 1877 (citing Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n, 138 S. Ct. 1719, 1730–32 (2018), and Lukumi, 508 U.S. at 533).

To be generally applicable, a law may not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct. See Lukumi, 508 U.S. at 543. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" Fulton, 141 S. Ct. at 1877 (quoting Smith, 494 U.S. at 884) (alteration in original). Under that rule, if a state reserves the authority to "grant exemptions based on the circumstances underlying each application," it must provide a compelling reason to exclude "religious hardship" from its scheme. Id. (quoting Smith, 494 U.S. at 884). Nor is a law generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Id. (citing Lukumi, 508 U.S. at 542-46).

We see no error in the district court's conclusion that the appellants have not met their burden of showing a likelihood of success on any aspect of their free exercise claims.

The appellants argue that the emergency rule is not neutral and is not generally applicable. They have shown no probability of success on those issues.

To start with, the rule is facially neutral, see Trump
v. Hawaii, 138 S. Ct. 2392, 2418 (2018), and no argument has been
developed to us that the state singled out religious objections to
the vaccine "because of their religious nature." Fulton, 141 S.
Ct. at 1877 (emphasis added).  The state legislature removed both
religious and philosophical exemptions from mandatory vaccination
requirements, and thus did not single out religion alone.

The rule is also generally applicable.  It applies
equally across the board.  The emergency rule does not require the
state government to exercise discretion in evaluating individual
requests for exemptions.  Unlike, for example, Sherbert v. Verner,
374 U.S. 398 (1963), in which the government had discretion to
decide whether "good cause" existed to excuse the requirement of
an unemployment benefits scheme, id. at 399-401, 406, here there
is no "mechanism for individualized exemptions" of the kind at
issue in Fulton, 141 S. Ct. at 1877 (quotation marks and citation
omitted).  Instead, there is a generalized "medical exemption . . .
available to an employee who provides a written statement from a
licensed physician, nurse practitioner or physician assistant
that, in the physician's, nurse practitioner's or physician
assistant's professional judgment, immunization against one or
more diseases may be medically inadvisable." Me. Rev. Stat. tit.
22, § 802(4-B).  No case in this circuit and no case of the Supreme
Court holds that a single objective exemption renders a rule not

generally applicable.  See Maryville Baptist Church, Inc. v. Beshear, 957 F.3d 610, 614 (6th Cir. 2020) (per curiam) ("As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law.").

The rule is also generally applicable because it does not permit "secular conduct that undermines the government's asserted interests in a similar way." Fulton, 141 S. Ct. at 1877; see Tandon v. Newsom, 141 S. Ct. 1294, 1296 (2021) ("[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue."). We conclude that exempting from vaccination only those whose health would be endangered by vaccination does not undermine Maine's asserted interests here: (1) ensuring that healthcare workers remain healthy and able to provide the needed care to an overburdened healthcare system; (2) protecting the health of the those in the state most vulnerable to the virus -- including those who are vulnerable to it because they cannot be vaccinated for medical reasons; and (3) protecting the health and safety of all Mainers, patients and healthcare workers alike.  See Smith, 494 U.S. at 874, 890 (upholding as constitutional a criminal prohibition on peyote ingestion that exempted those to whom "the substance has been prescribed by a medical practitioner" with no exemption for religious use).

Maine's three interests are mutually reinforcing. It must keep its healthcare facilities staffed in order to treat patients, whether they suffer from COVID-19 or any other medical condition. To accomplish its three articulated goals, Maine has decided to require all healthcare workers who can be vaccinated safely to be vaccinated.

Providing a medical exemption does not undermine any of Maine's three goals, let alone in a manner similar to the way permitting an exemption for religious objectors would. Rather, providing healthcare workers with medically contraindicated vaccines would threaten the health of those workers and thus compromise both their own health and their ability to provide care. The medical exemption is meaningfully different from exemptions to other COVID-19-related restrictions that the Supreme Court has considered. In those cases, the Supreme Court addressed whether a state could prohibit religious gatherings while allowing secular activities involving everyday commerce and entertainment and it concluded that those activities posed a similar risk to physical health (by risking spread of the virus) as the prohibited religious activities. See, e.g., Tandon, 141 S. Ct. at 1297 (rejecting the California order that restricted worship but permitted larger groups to gather in "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants"); Roman Cath. Diocese of

Brooklyn v. Cuomo, 141 S. Ct. 63, 66-68 (2020) (per curiam)
(rejecting the New York order that restricted worship but permitted
larger groups to gather at "acupuncture facilities, camp grounds,
garages, as well as many [businesses] whose services are not
limited to those that can be regarded as essential, such as all
plants manufacturing chemicals and microelectronics and all
transportation facilities"); see also S. Bay United Pentecostal
Church v. Newsom, 141 S. Ct. 716, 717 (2021) (statement of Gorsuch,
J., joined in part by four justices) (criticizing the California
order that restricted worship but permitted larger groups to gather
in "most retail" establishments and "other businesses").    In
contrast to those cases, Maine CDC's rule offers only one
exemption, and that is because the rule itself poses a physical
health risk to some who are subject to it.[8]  Thus, carving out an
exception for those people to whom that physical health risk
applies furthers Maine's asserted interests in a way that carving
out an exemption for religious objectors would not.

Unlike the medical exemption, a religious exemption
would not advance the three interests Maine has articulated.  In
contrast to the restrictions at issue in Tandon, Roman Catholic
Diocese, and South Bay United, Maine's rule does not rest on

---

[8]    Those risks can be serious and even life threatening.
For example, the COVID-19 vaccines are contraindicated for those
who have had allergic reactions to a component of the vaccines.

- 21 -

assumptions about the public health impacts of various secular or religious activities. Instead, it requires all healthcare workers to be vaccinated as long as the vaccination is not medically contraindicated -- that is as long as it furthers the state's health-based interests in requiring vaccination. Thus, the comparability concerns the Supreme Court flagged in the Tandon line of cases are not present here. See Tandon, 141 S. Ct. at 1296 ("Comparability [for free exercise purposes] is concerned with the risks various activities pose, not the reasons why people gather." (emphasis added)). By analogy, if Maine's emergency rule were an occupancy limit, it would apply to all indoor activities equally based on facility size, but it would exempt healthcare facilities. That analogous policy would serve the state's goal of protecting public health, while maximizing the number of residents able to access healthcare and thus minimizing health risks. Such a rule would not fall afoul of the Supreme Court's decisions. See Tandon, 141 S. Ct. at 1296. The rule is generally applicable. And it easily satisfies rational basis review.

Strict scrutiny does not apply here. But even if it did, the plaintiffs still have no likelihood of success.

"Stemming the spread of COVID-19 is unquestionably a compelling interest . . . ." Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 67; see also Workman v. Mingo Cnty. Bd. of Educ., 419 F. App'x 348, 353 (4th Cir. 2011) ("[T]he state's wish to prevent the

spread of communicable diseases clearly constitutes a compelling interest."). Few interests are more compelling than protecting public health against a deadly virus. In promulgating the rule at issue here, Maine has acted in response to this virus to protect its healthcare system by meeting its three goals of preventing the overwhelming of its healthcare system, protecting those most vulnerable to the virus and to an overwhelmed healthcare system, and protecting the health of all Maine residents. In focusing the vaccination requirement on healthcare workers, Maine has taken steps to increase the likelihood of protecting the health of its population, particularly those who are most likely to suffer severe consequences if they contract COVID-19 or are denied other needed medical treatment by an overwhelmed healthcare system.

We begin by asking "not whether the [state] has a compelling interest in enforcing its [rule] generally, but whether it has such an interest in denying an exception" to plaintiffs. Fulton, 141 S. Ct. at 1881. If any healthcare workers providing such services, including the plaintiffs, were exempted from the policy for non-health-related reasons, the most vulnerable Mainers would be threatened. Cf. id. at 1881-82.

Maine also reasonably used all the tools available to fight contagious diseases. Its rule, thus, does not fail narrow

tailoring.[9] The available tools roughly fit into two categories. The first category involves pharmaceutical interventions. The second involves non-pharmaceutical interventions. Maine CDC and Maine HHS have considered their experience with both categories.

The first category itself contains two types of interventions. The COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected. Vaccination also reduces a person's risk of transmitting COVID-19 to others. There are also treatments that can be administered to infected patients once they have contracted the disease. Because those treatments do not prevent infections, Maine established in the record that reliance on such treatment options would not meet its goals.

The second category is one in which Maine actively engaged before the mandate and included measures like testing, masking, and social distancing. Those measures proved to be ineffective in meeting Maine's goals. As to testing, Maine CDC

---

[9] The appellants claim they were forced to bear the burden of showing that the regulation failed strict scrutiny. The district court's decision belies that claim. See Doe, 2021 WL 4783626, at *12 ("The government must also demonstrate that it 'seriously undertook to address the problem with less intrusive tools readily available to it' and 'that it considered different methods that other jurisdictions have found effective.'" (quoting McCullen v. Coakley, 573 U.S. 464, 494 (2014)). As we do here, the district court required Maine to show that its rule satisfied strict scrutiny. Maine met that burden by showing that it considered alternative means of achieving its goals and that those alternatives were inadequate.

concluded that regular testing cannot prevent transmission given how quickly an infected person can transmit the delta variant and how long accurate testing takes. And Maine experienced multiple COVID-19 outbreaks in healthcare facilities adhering to mandatory masking and distancing rules. Thus, Maine has shown that non-pharmaceutical interventions are inadequate to meet its goals. See Doe, 2021 WL 4783626, at *3, *12-14 (making factual findings about the inadequacy of non-pharmaceutical alternatives).

Maine has demonstrated that it has tried many alternatives to get its healthcare workers vaccinated short of a mandate. These include vaccine prioritization, worksite vaccine administration, and prizes for vaccination. But both its healthcare-worker-focused efforts and general incentives have failed to achieve the at least 90% vaccination rate required to halt community transmission of the delta variant. Maine has no alternative to meet its goal other than mandating healthcare workers to be vaccinated. See id.

As part of our narrow tailoring analysis, we consider whether the rule is either under- or overinclusive. See Lukumi, 508 U.S. at 546. The rule is not. The regulation applies to all healthcare workers for whom a vaccine is not medically contraindicated. Indeed, eliminating the only exemption would likely be unconstitutional itself. See Jacobson v. Massachusetts, 197 U.S. 11, 38-39 (1905). Nor is the regulation overinclusive.

It does not extend beyond the narrow sphere of healthcare workers, limiting the universe of people covered to those who regularly enter healthcare facilities. The emergency rule is thus focused to achieve the state's goal of keeping its residents safe because it requires vaccination only of those most likely to come into regular contact with those for whom the consequences of contracting COVID-19 are likely to be most severe.

Out-of-circuit authorities to the contrary are distinguishable and not persuasive. The appellants stress Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359 (3d Cir. 1999) (Alito, J.), in which the Third Circuit prohibited a police department from offering medical but not religious exemptions to its facial hair policy. It applied strict scrutiny to the policy after determining that the police department's disparate allowance of exemptions suggested a discriminatory intent. Id. at 365. But critically, the police department sought to justify its policy by pointing to its interest in a uniform appearance among police officers. Id. at 366. Thus, the Third Circuit concluded, the medical exemptions undermined the police department's interests, which "indicate[d] that the [d]epartment has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." Id. But, in doing so, the court also distinguished the

police department's exemption from the no-beard policy for undercover officers, explaining that the undercover officer exemption "does not undermine the [d]epartment's interest in uniformity because undercover officers obviously are not held out to the public as law enforcement." Id. (quotation omitted). The court further recognized that the very restriction on a controlled substance that the Supreme Court upheld in Smith contained an exemption permitting use of the substance for individuals to whom the substance "ha[d] been prescribed by a medical practitioner." Id. (quoting Smith, 494 U.S. at 874). Neither this medical prescription exemption in Smith, the court explained, nor the exemption for undercover officers, "trigger heightened scrutiny because the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing." Id. Here, in contrast, the medical exemptions support Maine's public health interests. Maine would hardly be protecting its residents if it required them to accept medically contraindicated treatments. Rather than undermine Maine's asserted governmental interest, the health exemption supports it. Therefore, Maine's providing medical but not religious or philosophical exemptions does not suggest an improper motive.

Nor do the appellants find support in their citation of the Sixth Circuit's recent decision denying a stay pending appeal of a preliminary injunction in Dahl v. Board of Trustees of Western

Michigan University, No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) (per curiam). In Dahl, the District Court for the Western District of Michigan preliminarily enjoined a state university from requiring student-athletes to be vaccinated in order to participate in athletic activities. Id. at *1. The university's policy provided that "[m]edical or religious exemptions and accommodations will be considered on an individual basis." Id. at *4. The Sixth Circuit held that the policy provided a "mechanism for individualized exemptions," applied strict scrutiny, and held that the policy was not narrowly tailored to meet the university's goals. Id. at *4-5. The emergency rule here is materially different from the university's policy in Dahl. First, Maine's emergency rule does not allow any government official discretion to consider the merits of an individual's request for an exemption. Even so and even assuming that strict scrutiny applies, Maine has narrowly tailored its rule. That conclusion follows from the second key distinction between this case and Dahl: the vaccination requirement in Dahl required vaccination only of athletes, not of the thousands of other students with whom the athletes may live, study, eat, and socialize. See id. at *5. In contrast, the Maine rule covers everyone who works with the medically vulnerable population in healthcare facilities. Unlike the university's athletes-only policy, Maine's emergency rule is not underinclusive even under Dahl because it encompasses every employee working in

a setting posing a serious risk of COVID-19 exposure and transmission.

Finally, the appellants' reliance on recent decisions in New York does not advance their cause. See Dr. A. v. Hochul, No. 1:21-cv-1009, 2021 WL 4734404 (N.D.N.Y. Oct. 12, 2021) (granting preliminary injunction); see also We the Patriots USA, Inc. v. Hochul, No. 21-2179 (2d Cir. Sept. 30, 2021) (unpublished order) (granting in part injunction pending appeal). In Dr. A., a group of healthcare workers challenged under the Free Exercise Clause an emergency regulation issued by the New York State Public Health & Health Planning Council, which required most healthcare workers in that state to be vaccinated against COVID-19.[10] The Maine regulation here is distinguishable from the New York regulation at issue in Dr. A. Eight days after New York officials promulgated a version of the regulation containing a religious exemption, they amended the regulation to "eliminate the religious exemption." 2021 WL 4734404, at *8. In light of that change, Dr. A. found that state officials had singled out religious believers through a "religious gerrymander." Id. In contrast, Maine's legislature eliminated religious and philosophical exemptions to mandatory vaccination in May 2019 and Maine voters approved the law in March

_____

[10] The Dr. A. plaintiffs also raised Title VII claims. We believe the Title VII analysis in Dr. A. is erroneous for the same reasons the appellants' Title VII claims fail here. See infra Part II.A.2.

2020. That timeline does not support a claim of religious gerrymandering. Nor have the appellants developed a religious animus argument on appeal. Dr. A. is also inapplicable because it found that New York had failed to explain why the testing and masking alternatives offered to medically exempt healthcare workers were inadequate. 2021 WL 4734404, at *9-10. In contrast, Maine has explained, and the district court found, that testing and masking would not achieve Maine's vital goals to the extent that vaccination would. See Doe, 2021 WL 4783626, at *14. Further, unlike in Dr. A., Maine has demonstrated that given the "limited" nature of its healthcare workforce and its significant elderly population -- the highest in the nation -- it has tried and failed to control "numerous COVID-19 outbreaks at health care facilities," even after multiple attempts to implement a variety of alternative measures. In confronting the various risks to its own population and its own healthcare delivery system, Maine's rule does not violate the Constitution. See S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring).

### 2.

The appellants also assert claims against the state appellees under the Equal Protection Clause, against the hospitals under Title VII, and against all appellees under the Supremacy Clause and 42 U.S.C. § 1985. We find no error in the district

court's conclusion that they are unlikely to succeed on any of those claims. See Doe, 2021 WL 4783626, at *15-16.

When a free exercise challenge fails, any equal protection claims brought on the same grounds are subject only to rational-basis review. Locke v. Davey, 540 U.S. 712, 720 n.3 (2004); Wirzburger v. Galvin, 412 F.3d 271, 282 (1st Cir. 2005). As the appellants are unlikely to succeed on their free exercise claims, they are unlikely to succeed on their equal protection claims as well.

The appellants' Supremacy Clause argument rests on their assertion that the hospitals (in concert with the state appellees) have "claim[ed] that the protections of Title VII are inapplicable in the State of Maine." The record simply does not support that argument. The parties agree that Title VII is the supreme law of the land; the hospitals merely dispute that Title VII requires them to offer the appellants the religious exemptions they seek. See Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281-83 (1987) (describing "narrow scope" of preemption under Title VII). The appellants have not shown their entitlement to an injunction under the Supremacy Clause.

Nor do the appellants fare better in their Title VII arguments for a preliminary injunction.[11] To obtain a preliminary

---

[11] Appellee Northern Light argues that the appellants waived their request for injunctive relief by not including it in

injunction, the appellants must show that they have inadequate remedies at law. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1019 (1984). When litigants seek to enjoin termination of employment, money damages ordinarily provide an appropriate remedy. To obtain an injunction, therefore, the appellants must show a "genuinely extraordinary situation." Sampson v. Murray, 415 U.S. 61, 92 n.68 (1974); cf. Matrix Grp. Ltd. v. Rawlings Sporting Goods Co., 378 F.3d 29, 34 (1st Cir. 2004) (holding that an injunction is unavailable in ordinary breach of contract action). The district court determined that the appellants "have not shown that the injuries they have suffered or may suffer -- the loss of their employment and economic harm -- meet [that] high standard," noting that the appellants had not exhausted their administrative remedies. Doe, 2021 WL 4783626, at *16; see Fort Bend Cnty. v. Davis, 139 S. Ct. 1843, 1850-51 (2019) (describing exhaustion requirements).

We find no error in that conclusion. Indeed, our court has expressly declined to provide such preliminary relief, and has declined to "reach the question of what circumstances would justify a district court in granting preliminary relief in such cases,"

---

their earlier request for an injunction pending appeal. We may properly consider that request in our review here of the district court's denial of preliminary injunctive relief against all parties, as the appellants have preserved and developed their argument on appeal.

finding only that "[a]t a minimum, an aggrieved person seeking preliminary relief outside the statutory scheme for alleged Title VII violations would have to make a showing of irreparable injury sufficient in kind and degree to justify the disruption of the prescribed administrative process." Bailey v. Delta Air Lines, Inc., 722 F.2d 942, 944 (1st Cir. 1983). The appellants have failed to demonstrate why they are entitled to pre-termination relief despite their failure to exhaust, given that the loss of employment "does not usually constitute irreparable injury" except in "the genuinely extraordinary situation" going beyond mere cases of "insufficiency of savings or difficulties in immediately obtaining other employment." Sampson, 415 U.S. at 90, 91 n.68. That is true regardless of whether the appellants have administratively exhausted their claims. The appellants' failure to exhaust does not put them in a better position to seek extraordinary relief. And even if the appellants were entitled to an injunction, they have not shown a likelihood of success on the ultimate merits questions. The hospitals need not provide the exemption the appellants request because doing so would cause them to suffer undue hardship. See Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 134 (1st Cir. 2004); see also Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 67 (1st Cir. 2020) (holding that "liability for failure to engage in an interactive process depends

- 33 -

on a finding that the parties could have discovered and implemented a reasonable accommodation through good faith efforts").

Finally, the appellants are unlikely to succeed on their § 1985 conspiracy claims. To properly plead a § 1985 conspiracy, the appellants "must allege the existence of a conspiracy, allege that the purpose of the conspiracy is 'to deprive the plaintiff of the equal protection of the laws,' describe at least one overt act in furtherance of the conspiracy, and 'show either injury to person or property, or a deprivation of a constitutionally protected right.'" Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021) (quoting Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)). To allege that a civil rights conspiracy exists, they "must plausibly allege facts indicating an agreement among the conspirators to deprive [them] of [their] civil rights." Id. at 577-78 (quoting Parker v. Landry, 935 F.3d 9, 18 (1st Cir. 2019)). Here the appellants do not allege that the hospitals had any role in the amendment of the statute or issuance of the regulation, only that they supported the regulation after the fact. Thus, their conspiracy claims are unlikely to succeed.

## B.

Having found no error in the district court's conclusion that the appellants are unlikely to succeed on the merits of any of their claims, we turn to its handling of the other preliminary injunction factors.

Even if, arguendo, these claims presumptively cause irreparable harm, we think the state has overcome any such presumption. Further, because the appellants have not shown a constitutional or statutory violation, they have not shown that enforcement of the rule against them would cause them any legally cognizable harm.

Finally, we review the district court's balancing of the equities and analysis of the public interest together, as they "merge when the [g]overnment is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Maine's interest in safeguarding its residents is paramount. While we do not diminish the appellants' liberty of conscience, we cannot find, absent any constitutional or statutory violation, any error in the district court's conclusion that the rule promotes strong public interests and that an injunction would not serve the public interest. See Doe, 2021 WL 4783626, at *17.

### III.

The district court's order denying a preliminary injunction is affirmed.